GERKE, Plaintiff in error, vs. THE STATE, Defendant in error.

*November 2, 1912—January 7, 1913.*

*Criminal law: Arson: Evidence: Sufficiency: Good reputation: Weight: Review on writ of error.*

1. One convicted of crime has not only the right to the solemn judgment of the trial court on the question whether his guilt was sufficiently proven, but upon writ of error he has the right to demand the deliberate opinion and judgment of this court upon the same question.
2. The evidence in this case (stated in the opinion) is *held* insufficient to sustain the conviction of a person charged with burning in the nighttime the dwelling house of another.

3. In such a case the facts that defendant had for years led the industrious and exemplary life of a reliable and law-abiding citizen, and that by his honest labor he had accumulated some property, do not prove his innocence; but a reputation of that kind carries much weight, especially when the evidence of guilt is doubtful and circumstantial.

ERROR to review a judgment of the circuit court for Manitowoc county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

*F. F. Groelle,* attorney, and *Robert J. MacBride,* of counsel, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, Russell Jackson,* deputy attorney general, and *John J. Healy,* district attorney, and oral argument by *Mr. Healy* and *Mr. Jackson.*

WINSLOW, C. J.    The plaintiff in error, hereinafter called the defendant, was convicted under sec. 4399, Stats. (1898), of burning the dwelling house of Henry Detjen in the nighttime when there were human beings therein, and was sentenced to ten years' imprisonment at Waupun.

A number of exceptions to the rulings of the court upon the trial are urged as grounds for reversal of the judgment, but it must be sufficient to say that we have found no serious or prejudicial error in any of the rulings complained of, and that if there were no other questions in the case the judgment would be at once affirmed.

The important question in the case, and one to which we have devoted careful attention, is the question whether there was sufficient evidence to sustain a verdict of guilt.    As has been previously said by this court, the prisoner has the right not only to the solemn judgment of the trial court on the question whether his guilt was sufficiently proven, but upon writ of error he has the right to demand the deliberate opinion and judgment of this court upon the same question. *Lonergan v. State,* 111 Wis. 453, 87 N. W. 455.    After diligent study of the record before us, we have come to the con-

clusion that the evidence of guilt was insufficient in this case. Without attempting to review the evidence exhaustively in this opinion, we shall attempt to state its general purport sufficiently to make plain the reasons for the conclusion reached.

The fire in question occurred at about 2 o'clock a. m. October 14, 1911. The building burned was a frame building, consisting of a country saloon, dance hall, grocery store, and dwelling house combined, which was kept and owned by one Henry Detjen, a man sixty-four years of age, and occupied by himself and his family as a dwelling house. The building was situated on the northeast corner of the crossing of two country roads in the county of Manitowoc, about five miles south of the city of that name. One of the roads ran due north and south and the other due east and west.

Detjen had bought the forty-acre farm on the corner of which the building was situated in 1903 for $6,000. He had erected some additional barn buildings thereon. The burned building was erected in 1900 at a cost of about $4,500, contained property of the estimated value of $1,500, and was insured for $2,900.

The defendant was an unmarried German, twenty-seven years of age at the time of the trial, *i. e.* in February, 1912. He came to this country six years before the trial of the case, and came directly to Neillsville, Wisconsin, where for about five years he worked at his business or trade, which was that of a stone mason, sometimes going to work in the woods in the winter. Five representative business men of Neillsville were put on the stand, and testified to the good character and reputation of the defendant during this period. It also appears that he was thrifty and made some accumulation of property. In August, 1911, he came to Manitowoc county to the vicinity of the burned building to make investigation (as he says) concerning the worth of a second mortgage on property in that vicinity, which mortgage he had taken on the sale of property at Merrillan Junction. At this time he

learned that a saloon and dance-hall building on the south-east corner of the same four corners, immediately across the highway south of the burned building, was for sale. One Charles Eau Claire then owned the building with five acres of land on which it stood and one-half acre of land on the northwest corner of the cross-road on which stood an unused blacksmith shop and shed.· There was a mortgage of $3,000 on the property to a brewing company. This saloon had been built about nine years previously and had been occupied successively by several proprietors and was empty for quite a period. Eau Claire had been in occupation for a little more than a year. The defendant purchased it for the agreed consideration of $5,000, of which $3,000 was represented by the mortgage aforesaid, $1,800 by two second mortgages on other property, which defendant transferred to Eau Claire as cash, and $200 which defendant agreed to pay to one Sommers. Eau Claire had an unexpired saloon license which was issued in the previous July, and in order to escape taking out a new license some sort of a paper writing was executed by the defendant and Eau Claire to the effect that the defendant was operating the place as agent or lessee of Eau Claire. The saloon and dance hall was lighted by kerosene lamps, of which there were some fourteen in all, and the defendant cooked his meals on a kerosene stove. There was a fifty-gallon barrel of kerosene oil nearly full in the cellar of the saloon when the trade was made. The defendant lived in the building and occupied one of the rooms as his sleeping room, and his dog was in the room with him at night.

There is no evidence of any ill-feeling between Detjen and the defendant at any time prior to October 8th,—in fact it appeared that the defendant bought his groceries, or a part of them, at Detjen's store. On the morning of October 8, 1911, at about 6 o'clock, as Detjen came out of his house in the morning he discovered a small fire burning on the outside at the northwest corner of his house, and smelled kerosene.

He put out the fire with the assistance of his son Reinhold. The testimony tends to show that on the morning of October 14th, at about 2 o'clock, Detjen's wife was awakened by smoke, that she called her husband and her two children, Reinhold and Ella (both adults), that Detjen went out and found another fire burning at the northwest corner of the house and found a pile of kindling there saturated by kerosene. The fire had already got into the studding of the house, and it was impossible to put it out, although efforts were made to do so. Reinhold and Ella soon came out, and they claim that they saw the defendant standing in the doorway of his saloon fully dressed and that he made no effort to help them. Neighbors soon began to arrive and efforts were made to save property. The night was still. The defendant's saloon being just across the road from the burning building was in danger of catching fire, and the defendant with the assistance of some of his neighbors threw water upon the windows and also upon the roof to prevent the flames from breaking out. The defendant admits that he stood at his door and saw a man and a woman, who were probably Reinhold and Ella, outside of the Detjen building, but says that he had a suit of gray underclothing but no shoes on, and that he had just been wakened by his dog jumping on the bed. He claims that he ran to the middle of the road, and that either Reinhold or Ella then hollered, "It does no good any more, get the stuff out," and then he started up the road eastward to the house of one Mahoskey, forty rods distant, and called to him several times, but could not rouse him; that he then ran back and went to the telephone and rang it several times but got no answer, and then went and dressed himself, and when he came out the neighbors had begun to come, and he, with some of the neighbors, began to make the necessary efforts to save his own building. As to the ringing of the telephone, the defendant seems to be absolutely corroborated by the witness Herman Carstens, called by the state, who lived

one half mile west of the corners and was on the same telephone line with *Gerke,* who testified that he was roused by his telephone ringing several times, but he did not answer because he thought he would be fooled, but that he got up some two or three minutes later, and saw the fire which suddenly became much brighter. Carstens further testified that when he got to the fire he saw *Gerke,* and *Gerke* told him that he rang him up and asked him why he didn't answer the phone, and he told him he thought some one was fooling again. Mahoskey also testified that he heard some indistinct calls in front of his house just before he was alarmed by another neighbor, and thus the defendant seems to be corroborated in another particular. That the defendant was very much excited and made a strenuous effort to save his own building and property is very certain.

There was testimony to the effect that the ground was saturated with kerosene at the place where the fire started and fire was seen burning on the ground in spots running from the northwest corner of the burned building about halfway across the road toward the unused blacksmith shop owned by the defendant, but there was no proof that there were any traces of oil in the blacksmith shop nor that any oil had ever been in the building.

It was shown that the attempt to burn the house on October 8th caused considerable talk in the neighborhood, that the defendant on the day before the second fire said to one of the neighbors who was in his place that they (the Detjens) "ought to watch,—it is just a week ago now, that son-of-a-gun might come around again."

It was also shown that the defendant stated to another neighbor some time before the fire that the business was going slow, that if there was only one saloon it would be better, and that he wasn't satisfied that he had made $50 since he had been there. It was also shown that he called on a brewing company in Manitowoc about the 1st of October and

asked them whether they didn't want to buy a saloon; also that he said to the sheriff after the fire, when the sheriff told him that he thought he (*Gerke*) burned the building, "Well if I did I will have to take it."

There was testimony to the effect that one evening after the first fire the defendant came into Detjen's saloon and told Detjen that his (Detjen's) wife had been talking with another woman outside and that she had said to the other woman that the fire came from his (*Gerke's*) side of the road; and that she must take that back; that Detjen then called his wife and she explained that she was talking with a Mrs. Repke about the fire, and in reply to a remark by Mrs. Repke to the effect that it was funny that that man should light that, and that other man that is here before he is gone, that's funny whoever could have done it, she replied, "Well, we can't tell, because we haven't seen it,—we don't know." After this explanation *Gerke* appears to have been satisfied, bought a glass of beer and went home.

It is believed that the foregoing statement comprises all of the significant facts tending in any way to inculpate the defendant.

It appeared that there was no insurance ever taken out by the defendant on his building, but that the mortgagees had $2,500 of insurance on the building, of which defendant was informed, and there is some claim by the state the defendant thought that this insurance was for his benefit, but this seems not very well substantiated. There were fifteen gallons of oil found in the barrel in defendant's basement after the fire. No oil had been bought by him since he started business with something less than fifty gallons, but the testimony seems ample to account for the missing amount by the use thereof in the lamps in the saloon, the dance hall (where two dances had been held), and the kerosene stove which he used daily to cook his meals. No smell of kerosene was found on the defendant's clothes, and no pails or receptacles were found in

his house which bore any indications of having been used to carry kerosene. The testimony on the part of the state tends to show that a large quantity of kerosene was spilled on the ground at the corner of the building and between the middle of the highway and the building. It seems impossible that there could have been fifteen gallons left in the defendant's barrel after the steady use thereof for nearly two months, if the great quantity which the evidence tends to show must have been used in starting the two fires had also been taken therefrom.

In the state's brief the following facts are claimed to be clearly established, and also to justify the conclusion that the defendant fired the building, namely: that the fire was deliberately set by some person with kerosene oil and kindling wood; that the defendant's building was not injured; that the parties were rivals in business and that it was generally known that both saloons could not pay, and that defendant was not making a success of the business; that he was deeply in debt, thought he had $2,500 insurance, stated that the business was slow and that if there was only one saloon it would be better, and tried to sell the property without avail; that he was conducting a saloon without license under a subterfuge agreement made to evade the excise law; that he was the sole occupant of his premises, had kerosene and kindling therein, and that the kerosene used in the fire came from the direction of his unused blacksmith shop; that on the previous day he said that Detjen had better watch out, as it was just a week since the first fire and the same person might come back to complete the job; that defendant was dressed and outside his building near the time of the starting of both fires; that he offered no aid, but was very solicitous about protecting his own property and that of others which was in no danger; and lastly, that the defendant did not definitely deny his guilt when the sheriff charged him with it.

It will be seen at once that there is not one item of direct

proof against the defendant from start to finish. There does not seem to have been any enmity or bitterness of feeling. The remarks made by defendant are fully as susceptible of an innocent as of a guilty construction. It is true there was a business rivalry, although there is no evidence tending to show that the rivalry had caused a single harsh word or thought on either side. It is entirely possible, of course, that the desire to do away with a business rival under such circumstances might be sufficient to induce some depraved minds to commit a crime like this, which when done in the night with people asleep in the building is little short of murder in its depravity. But here we meet another fact: it seems to be proven beyond dispute that the defendant for five years led the industrious and exemplary life of a reliable and law-abiding citizen, and that by his honest labor he accumulated some property. It is true that this fact does not prove innocence, but a reputation of this kind carries much weight, especially when the proof is doubtful and circumstantial. While there are some circumstances in this case tending to cast suspicion upon the defendant, we have been unable to conclude, even after giving to the opinion of the trial judge that weight to which it is entitled, that these circumstances are of sufficient weight to justify the conviction of a man whose previous life is shown to have been without reproach. Having reached this conclusion, we can do no less than to set aside the judgment and award a new trial.

*By the Court.*—Judgment reversed, and action remanded for a new trial. The warden of the state prison will deliver the plaintiff in error into the custody of the sheriff of Manitowoc county, who will hold him in custody to await the further order of the court.