MANNA, Plaintiff in error, vs. THE STATE, Defendant in error.

*December 8, 1922—January 9, 1923.*

*Criminal law: Right of accused to solemn judgment of appellate court: Venue: Sufficiency of proof: Separation of jury: Surgical aid to juror: Harmless error: Homicide: Proof of motive: Accidental killing as defense: Instructions: Reasonable doubt: Circumstantial evidence: Evidence: Statements in presence of accused: Tests as to distance of gun from deceased when discharged: Immaterial irregularities.*

1. On writ of error a person convicted of crime has a right to demand the solemn judgment of the supreme court as well as that of the trial court as to whether his guilt was sufficiently proven.

2. Where the accused admitted that deceased was killed by the discharge of his double-barrel shotgun, but claimed it was discharged accidentally when he fell on a railroad crossing, evidence that the wounds made by two charges of shot showed that the gun was at different positions when the two shells were discharged, and that it was very much closer to deceased than the distances stated by accused, is *held* sufficient to have led the jury to believe that the story told by defendant was false and to sustain a conviction for murder.

3. It is unnecessary to establish motive for a homicide when the facts of the shooting are fully proven, since the jury can presume motive if they conclude from those facts that the shooting was not accidental.

4. In a prosecution for homicide which occurred in the vicinity of a stone quarry, references in the evidence to a quarry in the county, in connection with a view of the premises by the court and jury, are sufficient to establish the venue of the offense within the county, where there was no controversy as to that fact raised at the trial. Something more than a bare technicality is required to disturb the verdict under sec. 3072m, Stats.

5. A charge that the jury are not to search for doubt but are to search for the truth is not erroneous when they were elsewhere expressly and repeatedly warned that they could not find a verdict of guilty unless convinced of the truth of the charge beyond a reasonable doubt, "reasonable doubt" being properly defined.

6. The defense being that the shooting was accidental, a charge that if defendant intentionally fired the shot that killed the deceased the jury should find him guilty was not erroneous for not stating that if the defendant intentionally fired the shot in O. county they should find him guilty.

7. A charge which, after stating that circumstantial evidence would justify a conviction, but that each of the several circumstances upon which the conclusion of guilt necessarily depends must be proved beyond a reasonable doubt, stated that the circumstances must point with moral certainty to the guilt of the defendant and exclude to a moral certainty every other reasonable hypothesis, and, taken together, must lead to the reasonable and moral certainty that the offense charged was committed, was not erroneous.

8. Testimony that some time before the shooting a witness had remarked in the presence of defendant that the latter was fooling with the wife of deceased and that defendant made no reply was competent, since his silence might be construed as an admission and thereby show motive for the killing.

9. There being evidence that defendant had taken the wife of deceased out in his automobile several times but always when others were present, so that there was no impropriety, and the evidence showed merely a friendly feeling, which defendant admitted, it was not error to exclude testimony by the wife of the deceased that she did not know of defendant ever doing any wrong.

10. Where the prosecution claimed that the wounds could not have been made if the gun was discharged at the distance from deceased that defendant claimed it was, evidence on

behalf of the state showing tests made with defendant's gun with cartridges similar to those used by him to show the area over which the shot would scatter was competent.

11. Defendant having claimed that deceased took several steps after being shot and before he fell, two surgeons of several years' experience, who were familiar with the anatomy of the body and the result of cutting or severing the arteries and nerves, could testify that the wounds they found on deceased would cause instant death, though neither had had any experience with that kind of gunshot wound or the result of such wound.

12. Where counsel for defendant had consented that the jurors be allowed to separate when in charge of an officer, and one juror, while cranking his automobile, broke his wrist and thereafter became separated from the officers for a few moments in procuring and submitting to surgical treatment, which the trial court found did not result in any improper influence upon his verdict, though the physician was a witness for the state, such separation was inconsequential and there was no prejudicial error on that account.

13. Though one accused of crime is entitled to a fair trial, not every irregularity need be treated as reversible error, but the court must apply its judgment and reason; and when it is plain that the rights of defendant were not prejudiced, immaterial irregularities are not grounds for a new trial under sec. 3072m, Stats.

ERROR to review a judgment of the circuit court for Ozaukee county: MARTIN L. LUECK, Circuit Judge. *Affirmed.*

Murder in the first degree. *Dominic Manna*, plaintiff in error, hereafter called the defendant, was found guilty of murder in the first degree on the 19th day of November, 1920, in the circuit court for Ozaukee county.

The defendant is charged with having feloniously and with malice aforethought shot and killed August Folcinelli on the 6th day of February, 1920. The scene of the alleged crime was at the Lake Shore stone quarry in Ozaukee county. Two maps of the locality were introduced in evidence, one by the state and one by the defendant. Both are drawn to scale and are testified to be accurate, but they differ in some respects in measurements, and there is some

confusion in the testimony in this respect. For the purposes
of this statement we take the defendant's Exhibit No. 2,
apply the scale, and give the figures approximately, accord-
ingly.

It appears that there were several people, Austrians,
Poles, and Italians, employed at the stone quarry, some of
whom had families living near by. The quarry had not been
running for a month and has been since abandoned.

At the northerly end of the map we find the blacksmith
shop, and directly south from the blacksmith shop, a
distance of 340 feet, was an old railroad track running
southwest by northeast. At the point on this railroad track
directly south from said blacksmith shop the defendant
claims that he fell and that a gun which he was carrying
was accidentally discharged, resulting in the shooting and
killing of Folcinelli. South from the front of the black-
smith shop 160 feet, and slightly to the west, was the front
of the engine room. Directly across to the west of the
blacksmith shop, about sixteen feet distant, was a machine
shop. The machine shop is not shown on the map, but
the evidence places it at this point. Between the engine
room and the point on the railroad track above mentioned
was a stock pile of stone of varying heights which had been
quarried and which obstructed the view from the black-
smith shop and engine room to the railroad track, more or
less. Running between the blacksmith shop and the machine
shop, in a southerly direction, was a road. This road ran
on the east side of the engine room, and as it left the engine
room going south it curved somewhat to the east so that
it crossed the railroad track about forty feet east of the
point where defendant fell, as he claims. It then curved
to the west and continued to the south over a small culvert,
which culvert was directly south of the blacksmith shop.
At a point fifty feet north from where the road crossed the
railroad track a path branched off and ran southwesterly
to and across the railroad track at the point where defend-

ant claims to have fallen, and continued in a southerly direction a distance of approximately fifty feet, where it rejoined the road. From the point where the path rejoined the road to the culvert was about forty feet. From such point of junction of the path with the road, along the road to the north, was a bunch of cedar trees, through which the road ran. From these cedar trees to the north where the path joined with the road was a distance of about eighty-six feet. Between the two junction points along the pathway the distance is approximately 117 feet, and along the roadway approximately 126 feet. From the blacksmith shop to the culvert is about 425 feet.

On the 6th of February, in the forenoon, the defendant went hunting with a double-barrel shotgun loaded with duck shot. It was a breech-loading gun and took a twelve-gauge cartridge. The right barrel was slightly choked. In one barrel was a cartridge of No. 4 duck shot, and in the other barrel a cartridge of No. 6 duck shot. He found no game and did not fire his gun, and at about 11 o'clock arrived at the blacksmith shop, where he put his gun upon a bench and then went across to the machine shop, where he met five men, Donaldson, May, Grelle, Thombari, and Zatello, who were working there. The defendant stayed there some time talking to them and went back to the blacksmith shop. There he cut a strip off of a metal sheet to make a stove poker and returned to the machine shop, where he met Grelle, Donaldson, May, and Folcinelli, the deceased. He returned to the blacksmith shop at about noon, took his gun, and started for his home, which was 750 feet south from the blacksmith shop along the road before mentioned. As he reached the engine room he saw Folcinelli ahead of him about ten or fifteen feet. Both men continued along the road in this manner, the defendant keeping behind Folcinelli. There were no words spoken, and it does not appear that Folcinelli knew that he was followed by the defendant. When the defendant reached the north point of junction of

the path with the road Folcinelli was about ten feet ahead of him on the road, and defendant turned on the path and followed that to the railroad track. The defendant says that when he was within two feet of the railroad track Folcinelli was under the cedar trees. He looked over to the defendant and said "If I see any crows." At this point defendant was two feet from the track. He stepped over the first rail of the track, slipped and fell, according to his testimony, and the gun struck the ground in such a way as to discharge both barrels. Immediately he looked up and saw Folcinelli to the south on the road at its junction with the path. Folcinelli was facing the defendant and staggered backward until he fell. The defendant got up, leaving his gun where it fell, and hurried back to the machine shop, where he called May and told him that he had fallen and accidentally shot Folcinelli. He asked May to go with him to Folcinelli. May did not go but Grelle did. When the defendant and Grelle reached Folcinelli they thought he showed life, but after a moment Grelle said that Folcinelli was dead. Thereupon the defendant went to his shack, about 330 feet further south on the road, to change his clothes and return, with the intention of going to Port Washington and surrendering himself to the authorities, which he did.

Grelle left the body of the dead man as it was and went away. Shortly thereafter Donaldson, who had heard the defendant's statement to May and Grelle, went out to the body, which he found about eight or ten feet north of the culvert. The body lay alongside the road on the snow bank, which was about one foot higher than the road and slanted upwards away from the road. The face was towards the north. The feet were about eighteen inches or two feet from the road, somewhat doubled up and under the body. Apparently Folcinelli had stepped out from the road into the snow bank about eighteen inches or two feet and then fallen, for the snow was not broken between the point where

he had fallen and the road.. There was a wound in the neck, and blood was found underneath in the snow. While Donaldson was viewing the body the defendant came from the south and met him near that point. Donaldson said "This is bad business," and asked the defendant how it happened. The defendant said that he fell on the railroad track, and that his gun was discharged by accident and shot Folcinelli. He went with Donaldson back to the railroad track where the gun lay and picked it up. He then pointed out to Donaldson that one of the hammers on the gun was bent out of place and that a piece of the gutta-percha on the stock was broken off. This piece he picked up from the ground and showed to Donaldson. Defendant then left for Port Washington to surrender to the authorities. The body was left in the same position as when found, until the coroner and sheriff came about 2 o'clock. The body then was taken to Port Washington and the clothes removed.

Folcinelli was dressed with heavy underclothes, corduroy pants, overalls, a heavy outside shirt, a woolen sweater, and a sheep-lined vest. When the clothing was removed it was discovered that Folcinelli had been shot twice, once in the left hip and once in the neck. In Folcinelli's left hip pocket he had a tin can of Velvet tobacco. The main part of the charge of shot had hit this can directly. Some of the shot had punctured both sides of the can and entered the body. Others were found in the can. Also in the can were found two gun-wads. The shot were scattered over an area measured by a circumference of five and one-half to six inches in diameter. The shot were not deeply imbedded in the body and the wound was not dangerous. The other shot had penetrated the clothing of Folcinelli at the top of the right shoulder joint and cut the flesh of the shoulder slightly. It then went on in a direct course at right angles with the spine, broke the collar bone, severed the jugular vein, the carotid artery, and the pneumogastric

nerve, and lodged partly against the spinal column, between the sixth and seventh cervical vertebræ, part glancing off and going a little further into the body. The charge had passed through the sheep-lined vest, the sweater, the over-shirt and undershirt, cutting a clean hole, and no shot were found outside the hole made by the entry of the discharge into the neck; in other words, there was no scattering of the shot, as in the hip. In probing the wound the doctors found two gun-wads, together with parts of the clothing and pieces of bone. Two doctors examined the wound, and testified that it was of such a character that Folcinelli would have fallen in his tracks, or nearly so, as a result of the injury. The doctor called on the part of the defendant testified that Folcinelli may have gone some distance before falling, possibly forty feet.

Folcinelli and the defendant had been warm friends for several years. The day before the tragedy the defendant had helped Folcinelli to butcher a pig, and it was under-stood that on the day of the tragedy he was to help Folcinelli cut it up. However, from the time of the killing of the pig on the day before, until Folcinelli was under the cedars just before the shot, the record is silent as to what, if any-thing, passed between these two men. It does not appear that when they met in the machine shop shortly before the tragedy any word passed between them. The record is silent as to that. It does appear that no word passed be-tween them while they were on the road going toward their homes, except as the defendant testified that Folcinelli inquired about the crows.

The poker which the defendant made was found near the path between where it branched off from the road and the railroad track.

The defendant reported to the sheriff and district at-torney at Port Washington, who, after taking his statement, allowed him to go home, and he was not arrested until four days thereafter. The officers did not then know, and the

defendant claims that he did not know, that Folcinelli had been shot twice. When the coroner discovered the facts he reported to the officers and they set about an investigation, resulting in the arrest and prosecution of the defendant. Defendant was convicted and sentenced to state's prison for life. From this judgment and sentence he appeals, and assigns as errors the following: the court erred in denying defendant's several motions for the discharge of the defendant and in refusing to direct a verdict of not guilty; in denying defendant's motion to set aside the verdict and discharge the defendant; in holding that venue and jurisdiction had been sufficiently established by the evidence; in its charge to the jury; in rejecting and in receiving testimony; in denying defendant's motion for a new trial.

For the plaintiff in error there was a brief by *Martin, Martin & Martin* of Green Bay, attorneys, and *James A. O'Callaghan* of Chicago, of counsel, and oral argument by *Mr. P. H. Martin* and *Mr. O'Callaghan.*

For the defendant in error there was a brief by the *Attorney General* and *J. E. Messerschmidt,* assistant attorney general, *Albert W. Grady* and *Chas. J. Kunny,* special district attorneys of Ozaukee county, and oral argument by *Mr. Grady, Mr. Kunny,* and *Mr. Messerschmidt.*

CROWNHART, J. In a criminal case involving grave consequences the conscience of the trial court should be satisfied that the evidence justifies a verdict of guilty. And on writ of error a person convicted of crime has a right to demand the solemn judgment of this court as well as of the trial court as to whether his guilt was sufficiently proven. *Lonergan v. State,* 111 Wis. 453, 456, 87 N. W. 455; *Gerke v. State,* 151 Wis. 495, 139 N. W. 404; *Hamilton v. State,* 171 Wis. 203, 176 N. W. 773.

The verdict in this case is challenged at the outset because it is not sustained by the evidence, under the tests laid down by the decisions. The first two assignments of error

may be treated together, and these bring before us the entire testimony to enable us to judge whether or not the proof is sufficient to sustain the verdict.

The defendant was a single man of Italian birth who came to this country about 1906. He was a workman at the quarry nearly all the time since 1906 and had borne a good reputation. At the quarry he met Folcinelli, also an Italian by birth, who was then unmarried but who was married shortly thereafter in 1909 to Mrs. Folcinelli. The two men had been fast friends up until the day before the death of Folcinelli. Nothing appears in the record to show that there had been any quarrel between them prior to the shooting. The defendant left the engine room on the road ten or fifteen feet behind Folcinelli. The two men spoke no word. When the defendant reached the by-path leaving the road to the west, he was close behind Folcinelli; as he said, "It might be closer than ten feet." When he reached within two feet of the railroad track, according to the defendant's story, Folcinelli was at the clump of cedars. At this point defendant claims Folcinelli spoke to him, asking if he saw any crows. Bearing in mind that defendant was within two feet of the railroad track where he claimed he slipped and fell, that Folcinelli was at the clump of cedars, and that both kept on walking, it will be seen from the statement of facts that Folcinelli had to walk thirty-five to forty feet before he would reach the point where defendant claims he was shot. During that time the defendant had to make only a single step, at most two steps, before he fell. It would seem from the defendant's own testimony that it would be highly improbable that Folcinelli could be at the point of the junction of the road with the pathway at the time it is claimed the defendant fell and the shots were fired. Or, take the case upon the hypothesis that defendant was ten feet behind Folcinelli when he reached the north junction of the path and road,—the defendant had to travel only 80 feet along the path to the railroad track dur-

ing the same time that Folcinelli had to go 126 feet along the road to reach the point where defendant claims he was shot. In either case it would seem that the gun would have been discharged before Folcinelli reached the point of danger. Both of these propositions are established by the evidence of the defendant himself and the application of the scale to defendant's map, Exhibit 2. The distances are physical facts not subject to dispute.

Again, the distance from the point where it is claimed defendant fell to the point where he claims Folcinelli was shot was not less than fifty feet. This is undisputed. The ground where Folcinelli stood when shot, as claimed, was 2.1 feet lower than the top of the rail of the track. Two shots were fired practically simultaneously, on the theory of the defense that it was an accident. One shot went into the left hip at the pocket, and the angle of the barrel of the gun must have been materially changed between the two shots in order to take effect in the left hip in one shot and in the right shoulder and neck in the other. The hip shot may have been fired from a line drawn nearly level with the ground, where the gun lay, but the other shot, penetrating at right angles with the spine, and with the course of the charge straight into the neck from the upper point of the right shoulder, must have been fired from the gun at a very different angle. We can conceive of the body having hurriedly assumed a different position after the first shot, but we cannot understand how either the gun or the body was likely to accommodate itself to the shot in the neck from the hypothesis that the gun was fired while lying on the ground, as defendant claimed.

It would seem certain that the shot in the hip was the first to take effect, under the claims of the defendant, for it was not possible for the body to have been in a position to have received the fatal shot save from sudden, unnatural movements as might result from unexpected pain and fright, and it would seem fairly demonstrable that the first

shot on hip wound was fired from the greater distance. There the shot scattered over an area measured by a circumference of five and one-half to six inches in diameter, while in the neck wound the shot was bunched and not scattered at all. The neck wound had a diameter of about one and one-half inches.

Experiments made with the gun with like cartridges used by the defendant demonstrate that when fired at a distance of thirty feet the shots scattered over an area measured by a circumference twenty-three inches in diameter, and fired at a distance of ten feet, to circumscribe the shot in the target required a diameter of five inches. From these experiments it seems fairly certain that the hip shot could not have been made at a much greater distance than ten feet, and the neck shot at a lesser distance than ten feet. A fact favorable to this view is that in the tobacco box were found gun-wads, and likewise buried deep in the neck wound were found gun-wads. These gun-wads were of felt, and by an examination of the cartridge it is shown that they were placed over the charge of smokeless powder, being three in number in each cartridge. Between each felt was a thin piece of paper. In order that these light wads may follow the shot into a wound it is necessary that the shot be fired at fairly close range so that the shot may hold together sufficiently to make a fairly large hole. The distance, as we have seen, from which the shot was fired to where Folcinelli was when hit, on the accident theory, was not less than fifty feet—a distance altogether improbable according to the experiments and the character of the wounds.

Folcinelli, after receiving his fatal wound, must have gone backward, according to the claims of the defense, sixteen feet or more, and then made a step of eighteen to twenty-four inches to the side before he collapsed. In view of the character of the neck wound this is highly improbable if not impossible. The jugular vein, carotid artery, and pneumogastric nerve were completely severed; the collar

bone was broken, and the shot was lodged against the vertebræ. The doctors for the state claimed that such an injury would drop a man almost instantly. There was testimony to the contrary, but the jury had a right to accept the state's view. From these physical facts, largely undisputed, the jury may well have come to the conclusion that the story of the defendant was not true. If defendant's story falls the defense falls, for the shooting is admitted.

There were other circumstances that may have legitimately aided the jury in arriving at such a verdict. Up to the time of butchering the pig the day before the tragedy the defendant and Folcinelli had been fast friends. However, no one gave a history of these men the night before. There is no evidence of friendly converse between them on the day of February 6th, unless we accept the defendant's claims of question and answer about the crows. The two men had been in the same shop shortly before the fatal shot. There is no evidence that they spoke to each other. The record is silent on this subject. They left for their homes, which were close together, at practically the same time, the defendant not more than fifteen feet behind Folcinelli, going the same road, and yet no evidence of either recognizing the other. There was no friendly call by the defendant to Folcinelli to wait for him to catch up and go home together. The defendant took the by-path, when he reached it, without any assigned reason for doing so. The distance by either path or road between the junction points is approximately the same. The poker the defendant had fashioned with care was lost or thrown beside the path. The two go on their diverse ways, presumably to meet again on the same roadway for home. But Folcinelli is shot by the defendant's gun. The defendant does not go near the body of his friend to lend him aid, but hurries back to summon others to the scene. It would seem that aid might have been easily summoned from the point where the body lay, by a lusty halloo.

These things, unexplained, may likely have suggested to the jury some snapping of the heretofore friendship of these two men. Such things happen. Some betrayal of friendship brings bitter resentment. Some act of disloyalty brings sudden revenge. Certainly the final passage in the act fails to show any warm friendship or attachment along the lonely road toward the homely cottages of these men.

It is unnecessary to establish motive for crime. Where, as in this case, the facts of shooting are fully proven, the jury are at liberty to presume motive if they come to the conclusion that the shooting was not accidental. Here the plaintiff made some attempt to show motive, of which we will treat later, and the defense sought to show lack of motive. We merely say that the defense would have been stronger if the proof had established the warm friendship of the past down to the time of the shooting. The jury were at liberty to regard defendant's actions in following Folcinelli, as he did, from the engine house, without speech on his part, as suspicious. They were at liberty under the evidence to find that both shots were fired close up—the hip shot at not more than ten feet distance and the neck shot at a shorter distance. If they so found, the defense fell, for under the theory of the defense the shots were fired when the victim was at least fifty feet distant. The jury may reasonably have found that defendant's story as to Folcinelli speaking about the crows while he was under the cedar trees was false; either that or the story of the accidental shooting was false. The facts do not jibe or seem reasonable. Folcinelli could not walk thirty-five to forty feet while the defendant took only one or two steps. The jury were privileged to find under the evidence that Folcinelli did not stagger backward sixteen feet or more before he fell, after having received his death wound. If they so found, we cannot say that their verdict is not justified by the evidence.

To sum up the evidence at this point: The defendant

admits the shooting of Folcinelli and sets up the defense of accident. At the time of the shooting he places Folcinelli at least fifty feet distant from him, and of this fact he could not be mistaken because of physical facts in evidence. The experiments in evidence are conclusive that shots fired from the same gun with similar cartridges, at a target thirty feet away, would scatter over an area twenty-three inches across, and necessarily the area would have been much greater at fifty feet distance. There was no scattering of the shot in the neck wound, and only a scattering embraced in a circle of six inches in diameter in the hip shot. From these experiments it is shown by incontestable evidence that the shots were not fired as claimed by defendant. The gun was in evidence. The defense was at liberty to make all the tests desired to satisfy the jury that the neck wound could have been made at the distance claimed without the shot scattering. The evidence concurs with our common experience and knowledge. Shot from an ordinary cartridge containing duck shot—either No. 4 or No. 6—will widely scatter at a distance of fifty feet. The location of the two shots makes defendant's testimony seem highly improbable. The claim that the victim staggered backward sixteen feet after he received the fatal shot, before he fell, seems equally improbable. All these facts may have reasonably led the jury to a verdict of guilty beyond a reasonable doubt.

Upon the whole record we come to the conclusion that the verdict of the jury is justifiable, and that it should not be disturbed unless there were errors on the trial.

The defendant raises the question of venue, claiming that the same was not established by the evidence. The trial proceeded upon the theory that the alleged offense took place in Ozaukee county. At the close of the state's case the defense moved that the defendant be discharged, but did not raise the point of lack of jurisdiction. At the conclusion of all the testimony the defense made a like motion, and again failed to raise the question of jurisdiction. It was only

after the verdict of the jury that this question was raised
by the defense, and then it was not claimed, nor is it
claimed here, that Ozaukee county was not in fact the
proper place of trial.    Referring to the evidence, we find
that Mr. Hales made a trip to the place where Folcinelli was
killed, for the purpose of making a map of the premises,
and that he did make such a map, which was introduced in
evidence.    He was asked:

"Q. You were asked, were you not, to go to the stone
quarry *in this county?*    A. Yes, sir. . . . I was asked to
make a map showing certain locations at the Lake Church
stone quarry. . . . The sheriff and the coroner pointed out
the location."

The sheriff also testified:

"Q. When you were out to the stone quarry *in this
county* on the 14th day of March, 1920, . . . did you point
out to Mr. Hales the location of where the body of August
Folcinelli had been found?    A. Yes, sir."

A view of the premises was had during the trial, and
the court and the jury examined the premises, together
with the sheriff and counsel for the state and for the
defense.    On the motion to set aside the verdict for failure
of proof of venue the court states that on his personal
knowledge and from such view the venue was properly
laid.    We conclude that the venue was sufficiently estab-
lished.    If it were now claimed, or if it had been claimed
before the lower court after the trial, in good faith, that
the scene of the crime was not in fact in Ozaukee county, a
different question would be presented.    But it is apparent
that the venue was properly laid, and something more than
a bare technicality is required to disturb the verdict. *Kellar
v. State,* 174 Wis. 67, 182 N. W. 321; sec. 3072*m*, Stats.

It is also claimed that the court erred in his charge to the
jury, in that he said "You are not to search for doubt, but
you are to search for truth."    We see no error in this

portion of the charge. It is undoubtedly true that the aim of the jury should be to ascertain the truth. When the court said that the jury was not to search for doubt, he plainly intended, and the jury must have so understood, that the purpose of a trial is to ascertain the facts and not the ascertainment of doubt, which is the negation of a fact. The jury were expressly and repeatedly warned that they should not find a verdict of guilty unless they were convinced of the truth of the charge beyond a reasonable doubt. "Reasonable doubt" was properly defined by the court.

Again, it is complained that the court charged that if the defendant intentionally fired the shot that killed Folcinelli, then the jury should find the defendant guilty. Here it is claimed that the court should have charged the jury that if the defendant intentionally fired the shot *in Ozaukee county* they should find the defendant guilty. We do not find that there is any exception taken to this portion of the charge. However, the charge must be taken as a whole, and we do not think this portion of the charge a prejudicial error.

It is also claimed that this portion of the charge was an error:

"And they must point with a moral certainty to the guilt of the defendant and exclude to a moral certainty every other reasonable hypothesis, . . . and the circumstances taken together must be of a conclusive nature leading, on the whole, to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the offense charged was committed."

This statement was preceded by a discussion of circumstantial evidence, and the court said:

"Circumstantial evidence is a recognized and accepted instrumentality of the law for the ascertainment of truth; and when it convinces the jury of the guilt of the accused beyond a reasonable doubt such evidence will justify a verdict of guilty just as well as direct or positive evidence.

But before one charged with a crime can be convicted on circumstantial evidence alone, each one of the several circumstances upon which the conclusion of guilt necessarily depends must be proved beyond a reasonable doubt."

Then follows the quotation above. Throughout the charge the court was at great pains to impress upon the jury that if they entertained a reasonable doubt of the defendant's guilt they should acquit him. Upon the whole charge we think this objection is untenable.

Objection is made to the testimony of Ferdinand Voeltz concerning the occurrence at the machine shop months before the accident. From the testimony it appears that Voeltz, something of a town character, given to drink but a good worker when sober, came in to the machine shop some months prior to Folcinelli's death and there met one Reis, the defendant, and others. Some joking conversation was had between the parties, and the defendant said to Voeltz: "What are you looking here for, are you looking for young women?" at which Voeltz became angry and replied: "No, I am not like you are, you are fooling with Marie's wife." Defendant made no reply to this charge. There is some question in the evidence as to whether defendant heard the expression of Voeltz, but it is fairly apparent that he was in a position where he might have heard, and the question of whether he did or not was one for the jury. If he did hear and made no reply, the authorities are to the effect that his silence might stand as an admission. This evidence was introduced for the purpose of showing motive. It was by no means conclusive, but it was not improper, in connection with other facts and circumstances which were also shown. The court properly instructed the jury with reference to the testimony on the subject of motive. We hold that there was no error in the introduction of this testimony.

It is claimed that the court erred in excluding testimony offered by the defendant. The defendant sought to prove

by Mrs. Folcinelli that she did not know of defendant's ever doing any wrong, in order to rebut any inference of impropriety on her part in going out with the defendant in his automobile. That was not an issue. The question was, What was the attitude of the defendant toward Mrs. Folcinelli? Was his feeling for her such that he would desire to do away with her husband? It was shown in the evidence that he had frequently taken her out riding in his automobile, but always in company with other persons, and it clearly appears that there was no impropriety on the part of either of them in this respect. The only inference that the jury could have drawn from this evidence, if any at all, was that the defendant had a friendly feeling toward Mrs. Folcinelli. This is not denied by the defendant; in fact it was admitted. Hence there was no reversible error in excluding the evidence offered.

It is claimed that there was error in receiving evidence of tests made with the gun of the defendant. These tests were properly received for the purpose of showing that Folcinelli was shot at close range. The tests disclosed that the shot would scatter, at a range of ten feet, over an area measured by a circumference six inches in diameter. That just about covers the situation with reference to the shot in Folcinelli's hip. However, in the shot in the neck there was no scattering of the shot, and the tests tend to show that that shot must have been fired at a still closer range. The tests were also admissible to show that the gun fired from the railroad track to the point where the defendant claims Folcinelli stood when he was shot, could not have made the wounds found upon Folcinelli's body. This was a distance of not less than fifty feet, and the tests established the fact that the shot would scatter over a circle having a diameter of more than twenty-three inches, at such a distance. The hole in the neck made by the entry of the shot was about one and one-half inches in diameter. There were no other shots found around this wound, on the face, neck, or body of

Folcinelli.   The tests did show that the gun fired at a distance of thirty feet would not place more than a dozen shots within a circle having a diameter of one and one-half inches.   We think the evidence shows that the tests were fairly made.   If the defense had any doubt on that subject they should have raised the objection on the trial, when they undoubtedly would have been permitted to make any tests with the gun that they desired.   There can be no question under the law that such tests, when fairly made, are admissible in evidence.   *Pollock v. State,* 136 Wis. 136, 116 N. W. 851.

A further objection to the introduction of evidence is made to the testimony of the doctors who testified on the part of the state.   Two doctors who so testified made a *post-mortem* examination of the body of Folcinelli.   They examined the wounds carefully, and testified on the trial as to what they found with respect thereto.   The witnesses were asked whether or not the character of the wound in the neck would indicate that Folcinelli came to an instant death as the result thereof.   Objection was made that neither doctor had had experience with that kind of a gunshot wound or the result of such a wound.   We think experience with a gunshot wound was unnecessary to qualify these men.   They were surgeons of several years' experience, and were familiar with the anatomy of the body and the result of cutting or severing the arteries and nerves of the body.   Upon that subject they could give an opinion. The defense was allowed to produce evidence along the same line.   The jury were properly instructed as to the effect of expert testimony, and we think there was no error in this respect.

By consent of counsel for defendant the jurors were allowed to separate but only when in charge of an officer. On such an occasion one of the jurors, while cranking his automobile, broke his wrist.   For a few moments he became separated from the officers in procuring and submitting to

surgical treatment. The surgeon who treated him was a witness for the state. Objection to this separation of the jurors was first made on a motion for a new trial. The court found from his investigation of the facts "that the separation of the juror Pollow from the rest of the jury, in order to have his broken arm treated, was not attended by any improper conduct, and it did not result in any improper influence on the verdict."

It is quite manifest to this court that the separation of the juror Pollow from the custody of the officer momentarily for the purpose of surgical treatment was inconsequential and that there is no prejudicial error on that account.

Defendant was entitled to a fair trial, but that does not mean that every irregularity must be treated as reversible error or even suspicious. The court must apply its judgment and reason, and when it is plain, as in this case, that there was no improper conduct and the rights of the defendant were not prejudiced, such immaterial irregularities as are liable to creep into any trial must be held of no avail as grounds for a new trial. Sec. 3072m, Stats.; *Oborn v. State,* 143 Wis. 249, 126 N. W. 737.

It was suggested on the argument in this court that the defendant did not have a fair trial because of prejudice against his race. There is nothing in the record to indicate this. No difficulty seems to have been had in getting a jury. The officers of the law, the district attorney and sheriff, seem to have been very friendly to the defendant, for they let him go free on hearing his story of the killing, and it was not till four days afterward that defendant was arrested. The trial seems to have been conducted with propriety on the part of the state; the district attorney did not seek to arouse any prejudice against the defendant on account of race; his address to the jury was not excepted to on this ground; the court seems to have been very fair to defendant on the trial; and, finally, the defendant was

represented by very able attorneys of experience in trial of criminal cases.

It is distressing to take away a man's liberty for life, but neither courts nor juries should permit mere sentiment to prevail over the evidence to the end that the course of justice be perverted. It was the province of the jury to weigh all the evidence, and when so weighed the jury came to a verdict of guilty beyond a reasonable doubt after a fair and impartial trial. The law must be vindicated. Civilized society has no other means of protection against the lawless.

*By the Court.*—The judgment and sentence of the circuit court is affirmed.

ESCHWEILER, J., dissents.