### UNITED STATES v. ROSSO.
### No. 291.

Circuit Court of Appeals, Second Circuit.
May 2, 1932.

Abraham L. Sainer, of New York City (Emanuel Harris, Theodore Berger, and Abraham L. Sainer, all of New York City, of counsel), for appellant.

George Z. Medalie, U. S. Atty., of New York City (Thomas J. Todarelli, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendant Victor Rosso, and his wife, Laura A. Horne Rosso, were indicted upon ten counts which charged them with having used the mails in a scheme to defraud in violation of section 215 of the United States Criminal Code (18 USCA § 338). Victor Rosso was convicted on all counts and his wife was acquitted on all counts. The government charged in the indictment, and sought to prove, that the defendant Victor Rosso and his wife devised a scheme to defraud the Great American Insurance Company and the Home Insurance Company by obtaining insurance policies from each company in the amount of $133,065 upon certain paintings falsely represented to be valuable works of art of the actual value of $266,130, and by thereafter having a fire set upon the premises where the portraits

were located in order to collect the insurance. Although we can see no reason for employing the mail fraud statute in a prosecution of this kind which we think should more properly have been instituted in the state courts, there can be no doubt that there was proof of a use of the mails in arranging for the insurance policies, transmitting proofs of loss thereunder, and taking other steps in connection with the scheme, sufficient to bring the case within the terms of the statute.

■ The question raised by the appeal is not, therefore, whether the proof formally satisfies section 215 of the United States Criminal Code (18 USCA § 338), but whether the government furnished sufficient proof to justify the jury in finding that the defendant Victor Rosso procured insurance upon the paintings in an excessive amount and thereafter caused them to be set on fire in order to collect the insurance. That there was ample evidence to justify a verdict that he did this seems to us entirely plain.

■ Victor Rosso and Laura A. Horne were married in Argentina in December, 1928, and in May, 1929, came to the United States bringing one hundred sixty oil paintings which were sent to the United States Appraisers' Stores and were classified as household effects. The paintings were appraised by Phelps of the Appraisers' Office in the Custom House at $5,000. The amount of this appraisal was not an important matter to the Customs Department because if the pictures were really brought in as household effects, and not imported for sale, they would be free from duty, and if the necessary affidavits to show that they were household effects were not forthcoming there would be a reappraisal by the same official. Nevertheless the testimony of Phelps, who was accustomed to make these appraisals for the government, was of some probative value and properly submitted to the jury for what it was worth.

In June, 1929, Victor Rosso leased a studio at 11 West Fifty-Sixth street, where he stored the paintings. About June or July, 1929, Victor Rosso ordered from an upholsterer named Roera six mattresses and eight pillows, stating that he was a decorator and wanted the mattresses for a customer. He at first talked about wool, but when Roera said that would cost from 90 cents to $1 a pound, he told him to make a cheaper mattress and straw was agreed upon for the filling. These mattresses were delivered in July, 1929. The instructions were to bring them to 11 West Fifty-Sixth street after 5 o'clock, as Rosso would not be there before that time. About June of the following year (1930), Rosso told Roera that he needed four more mattresses and six pillows and said not to fill them with straw but with "fine excelsior." There was evidence that these various orders were fulfilled.

The paintings were imported as the property of Mrs. Rosso and no insurance was taken out until April, 1930, about ten months after they had been placed in the studio, at which date insurance policies were issued to Mrs. Rosso for the sum of $133,065 each by the Great American Insurance Company and the Home Insurance Company respectively. Schedules giving a list of the paintings sought to be insured, with the names of the artists, and a valuation thereof fixed by Victor Rosso, were attached to each policy. These schedules showed an aggregate value of property insured amounting to $266,130, of which $5,450 represented furniture, carpeting, draperies, and other household furnishings, and the remainder paintings. There was testimony by the broker who arranged the insurance that the Rossos told him they were prepared to spend $4,000 on insurance, but the amount of the premiums which were paid upon the two policies taken out aggregated about $3,600.

On Sunday morning, October 26, 1930, at about 2:15 a. m., a fire broke out in the studio, as a result of which all the paintings with one exception were destroyed. Thereafter proofs of loss were filed by Mrs. Rosso, who claimed loss for the amounts set forth in the schedules attached to the original policies and swore that the fire did not originate through the design or procurement of the assured.

Victor Rosso furnished a written statement on October 27, 1930, to the fire marshal, to the effect that he was last in the studio at 7 p. m. on the night before the fire, at which time he securely locked it up for the night.

The firemen who came in answer to the alarm found the studio (which was on the fourth floor of 11 West Fifty-Sixth street) in flames. One Prill, an employee of the Consolidated Telegraph & Electric Subway, testified that he was at the corner of Fifty-Sixth street and Fifth avenue at the time the fire broke out, heard a crash of glass coming out of a window, saw flames shooting out, rang the fire alarm, and that the fire company came in about ten minutes.

Murray, a member of the fire company,

testified that when he got to the scene he heard a crash of glass and "a loud puffing sound—as if something was forced." Lieutenant Dunn, of the fire department, testified that when he got to the studio, firemen had a hose placed on the fire; "every time they would hit it, it would run, they could not seem to extinguish it * * * fire freeze was ordered." He said he smelled an odor of gasoline and that the flames would float on top of the water and not go out. He found two or three mattresses piled together in different spots; said they would put the fire freeze on and extinguish the fire, and when they started to overhaul the mattresses again there would be further ignition. Fireman Fitzgerald also testified that when he entered the studio on the fourth floor of 11 West Fifty-Sixth street the fire kept re-igniting all the time, "which showed there was some kind of oil there," and there was a smell like "gasoline, benzine, naphtha," or something of the sort. He also said mattresses were standing on their ends, that the mattresses burned until the men put the fire freeze on, that the water would not put them out; the more water hit them the more they burned.

Ryan, the battalion chief, testified that when water was put on the mattresses oil floated on top of the water, burning. He said a number of mattresses lay in the studio, piled together, and that when he had parts of the burning mattresses pulled apart the fire flared up with puffs and smelled of gasoline, benzine, kerosene, or something of that nature. He also said that he ordered the chemical fire extinguisher applied to put out the fire and that he took some of the excelsior down to Marshal Brophy of the fire department, and Brophy smelled it and said the odor was of gasoline—a statement to which Ryan acceded. Assistant Fire Marshals Copeland and Scott also testified that they detected an odor of gasoline in the excelsior. Brophy confirmed Ryan's story that the specimen of excelsior which Ryan had brought to him smelled of gasoline.

There was testimony by two other members of the fire company who were at the fire—Wells and Moran—that they smelled nothing but smoke; but Moran was on the fire escape and never left the fourth floor. The government's testimony which indeed received practically no qualification, except from Wells, indicated the presence of some volatile oil in the mattresses made of straw or excelsior and justified a jury in finding that they were intentionally impregnated

with oil and that the fire was deliberately set. The question remains whether there was sufficient evidence to permit a jury to find that the person who caused the fire to be set was Victor Rosso and that he did this in order to collect the insurance.

There was evidence that paints or turpentine which were in Rosso's studio were in a part of it which the fire did not penetrate and were unaffected by the burning of the pictures. Moreover, Rosso, in a written statement dated October 27, 1930, said "there are two sets of keys to my studio one held by me and one by my wife, * * *" so that apparently the defendants alone had access to the apartment. He said in the same statement that the paintings were the property of his wife and that she had received them as a legacy from her deceased uncle. The wife made a like statement as to the origin of the paintings. Brophy testified that Mrs. Rosso when examined by him on October 30, 1930, said that she first learned of the legacy from an attorney who came to see her at her mother's house in Cordoba, Argentina, and had the paintings delivered to her. She could give neither the name nor address of this lawyer. On November 15, 1930, Mrs. Rosso recanted and stated that her mother never lived in Cordoba, nor had she ever lived there herself or been there. She admitted that the paintings were not derived from her deceased uncle, but that they were her husband's and that she had first seen them in his studio in Buenos Aires. She said it was several months before the application for the insurance that she and her husband thought out the story of the legacy so that everything could be in her name, including the insurance. She said she and her husband together went to the broker's office and asked for insurance amounting to $266,130.

Victor Rosso likewise signed a statement on November 15, that he and his wife had made up the story that the paintings were a legacy to her, because he did not want it known that he had purchased them at auction sales in Buenos Aires. He said he could not give the name of any person from whom he had made the purchases except in case of a single picture styled "Inspiration," which he had purchased for $2,500 from one Pellegrini and had valued in the schedule at $8,500. He also said he had valued many of the other paintings at considerably more than he had paid for them. He said that he had denied that he had had a previous fire in his studio in Buenos Aires be-

cause such a thing would look bad in connection with the fire in New York. When he was asked by Brophy where he got the money to buy the paintings, he first said from painting portraits and afterwards from $200,000 that he won at the races, but could not give the name of any horse on which he had bet.

There was testimony by Brophy that Rosso told him that he had never had a fire before, and by Rost, an inspector for the insurance companies who looked over the paintings before the policies were issued, to the same effect. Rost also said that he was told that the paintings were originals, that they were given Mrs. Rosso by a rich uncle, that they were not for sale, and that the studio was to exhibit the pictures in order to create a showing for Rosso, who was a portrait painter. Mrs. Rosso afterwards said to McDonough, the agent who rented the studio, that she had represented that the paintings were heirlooms because a buyer would place greater value on "a picture that had been in one family for many years."

There were various lithographs and post cards found in the possession of Rosso which throw much light on the schedules. For instance, there was among the lithographs a one-page illustration from the Ladies' Home Journal of a painting styled "May Night," made by W. L. Metcalf, which is now in the Corcoran Gallery of Art in Washington. No. 105 in the schedules attached to the insurance policies is entitled "Night," W. L. Metcalf. Thus there is an indication that No. 105 was a copy of the lithographed illustration of the Metcalf painting in Washington, or of the painting itself. Among the other lithographs found in Rosso's possession was an illustration from the Ladies' Home Journal entitled "View on the Seine," by Homer Dodge Martin—the original of which is in the Metropolitan Museum of Art. No. 49 in the schedules is entitled "A View on the Seine," Homer D. Martin. It accordingly is plain that the painting in Rosso's studio was a copy. There was also found among Rosso's papers a lithograph entitled "Eugen Bracht (Dresden) Ziehende Wolken Karlsruher Kunsthalle." Under No. 13 in the schedules is an item entitled "Dawn," by E. Bracht. Moreover, there was testimony that numbers of the post cards and lithographs bore vertical and horizontal lines to facilitate reproduction by a copyist. This, two witnesses stated, was a convenient and common method employed by artists to facilitate copying

from such lithographs. Numerous lithographs with these lines found in Rosso's possession indicate that paintings having corresponding titles were copied from the lithographs, probably by Rosso himself. All this is sufficient to justify the jury in finding Rosso guilty of the crime charged.

First there was overwhelming proof that the fire was of incendiary origin:

There was really no answer to the government's testimony on this point except the statement of Wells that he only smelled smoke the night of the fire, and the testimony of the real estate agent McDonough and of a witness named Methot who went to the studio on the afternoon of October 26, and said they smelled no odor of gasoline, though they did not examine or smell the excelsior on the floor.

Second there was evidence to connect Rosso with the fire:

Large numbers of pillows and mattresses stuffed with excelsior were ordered by Rosso under the pretext that he wanted them for a customer, when they were in fact intended only for himself. After leaving his paintings uninsured for nearly a year, he took out insurance to the amount of $266,130. He concealed the previous fire in his Argentine studio from the inspector who went to look over the paintings before the policies were issued. He misrepresented the origin and ownership of the paintings and, when he was forced to admit that the pictures were his own and not his wife's, first accounted for the large amount alleged to have been paid for them by saying that they were purchased from moneys he had earned by his own portrait painting, but finally resorted to the inconsistent and silly claim that they were purchased from $200,000 that he had won at the races. The firemen found the mattresses piled in heaps in the studio and impregnated with gasoline or some other volatile oil. Furthermore there was evidence of overvaluation. The appraisal of Phelps affords evidence that the paintings were of slight value. The neglect for nearly a year to take out any insurance gives rise to such an inference. The testimony of Rosso that he paid $2,500 for the picture "Inspiration," even if believed, indicates that his valuation of $8,500 in the schedule was excessive. The post cards and lithographs taken in connection with the schedules tend to show that the paintings imported were not originals but were, at least in many instances, mere copies, prob-

ably by Rosso. Such copies were likely to have little value, and Rosso admitted that he had valued many of the paintings at considerably more than cost.

█ It was not even necessary for the government to prove an overvaluation. Rosso might have preferred cash in a lump to realizing upon his paintings through a gradual and perhaps slow liquidation, and if it was his purpose to have them burned in order to get the insurance the crime would be complete. We think the false statements about the prior fire in Argentina and about the origin and ownership of the paintings, coupled with the heavy insurance and the destruction of the property by a fire of plainly incendiary origin in a studio to which he and his wife had access, were sufficient proof to justify a jury in finding that he had devised a scheme to defraud.

In the case at bar proof was not lacking, as in People v. Wagner, 71 App. Div. 399, 75 N. Y. S. 950, and in Volk v. State, 184 Wis. 286, 199 N. W. 151, that the fire was of incendiary origin. Nor was it here as likely that the fire might have been caused by some one else as by the defendant. Gerke v. State, 151 Wis. 495, 139 N. W. 404.

█ It is contended on behalf of the appellant that the trial judge should have discharged the jury at 10:20 p. m., though it had been in conference only about five hours, merely because it reported that it had been unable to agree; likewise that he erred in instructing it that it was very desirable for it to agree when a trial had lasted so long and in telling it that it should retire and deliberate further, and that later, if it had not reached a verdict, he would have it taken to a hotel to resume its deliberations in the morning. In our decision in Dwyer v. United States (C. C. A.) 17 F.(2d) 696, a similar statement by a trial judge was held entirely proper. Indeed, we fail to perceive how the remarks of the experienced judge who presided at the trial in the present case can be regarded as objectionable, or how criminal justice could be reasonably administered if a jury had to be discharged the first moment it stated that its members could not agree.

We have examined the exceptions to the charge and to the refusals to charge and the assignments of error and hold that no error is presented thereby. The appellant was fairly tried and convicted, and the judgment is accordingly affirmed.