LONERGAN, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 10 — October 15, 1901.*

*Criminal law and practice: Court and jury: Sufficiency of evidence: Alibi.*

1. In a criminal prosecution, especially for a capital offense, the accused is entitled to have the sufficiency of the evidence passed upon by the trial judge, and also by the supreme court on writ of error if the question is properly presented by the record.

2. Three persons, while attempting to escape after having made an assault with intent to rob, met a police officer and one or more of them shot him. The overwhelming preponderance of the evidence fixed the time of the shooting at not earlier than 6:35 o'clock. A long freight train passed a depot about a quarter of a mile from the scene of the tragedy at 6:25, and, proceeding without stopping, had passed a tower house half a mile from both places at not later than 6:32. At 6:45, when said train was about two miles distant, a tramp, apparently in a drunken condition, was discovered on top of one of the cars.' The evidence identifying him as one of the men who did the shooting was very weak. *Held,* that the possibility of such tramp having been at the scene of the murder when it was committed was in such doubt as to require reversal of a conviction therefor.

ERROR to review a judgment of the circuit court for Fond du Lac county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

The plaintiff in error was tried in the circuit court for Fond du Lac county on an information charging him and one Prof. Shorty, *alias* John Morris, with the murder of one William Prinslow, a police officer of the city of Fond du Lac. He was convicted of murder in the first degree, and brings his writ of error to reverse the judgment pronounced on such conviction.

It appeared by the evidence that on the evening of November 18, 1898, at about 6:30 o'clock, or within a few minutes thereafter, an assault was made upon one George Seitz, a liveryman at Fond du Lac, and an attempt made to rob

Lonergan vs. The State.

him, by three unknown persons.  The assault took place upon the sidewalk of a street called Forest avenue, in said city, in front of the livery barn belonging to Seitz, which is located on Forest avenue, just west of the east branch of the Fond du Lac river.  The attempted robbery failed, and the three men ran across the bridge over the river easterly on Forest avenue, and then turned south past the depot of the Chicago, Milwaukee & St. Paul Railroad, and when they were a little south of First street (the first street south of Forest avenue running east and west) they were met by Officer Prinslow, who was coming from the south, and three shots were fired by one or more of the escaping criminals, inflicting vital injuries upon Prinslow, causing his death. No one saw the three assailants of Seitz so that they could positively identify them.  The evening was dark and somewhat stormy.  After the shooting of the officer by the men they were not identified again by anybody and were not pursued.  The Chicago & Northwestern Railway tracks run north and south through the city of Fond du Lac, the main depot of the company being located a little over two blocks from the place of the assault, and a little south thereof: The Chicago & Northwestern line runs almost due north and south, and the Chicago, Milwaukee & St. Paul line, after leaving its depot, runs southwest, and crosses the Northwestern line, forming a junction at a point about one half mile south of the Northwestern depot, where there is a tower house and a man located in charge thereof.  Six hundred or eight hundred feet south of this tower house are the coal sheds of the Northwestern company, and about two and one half miles south from the tower house is a bridge, which carries a wagon road over the Northwestern track at the summit of a grade which commences about at the coal sheds.  The plaintiff in error and the other defendant, Prof. Shorty, *alias* John Morris, were seen around town in Fond du Lac on the day of the murder, and had been seen

together during that day in the vicinity of a place called Five Points, four or five blocks south of the place of assault, and a short distance north of the tower house and the coal sheds. Both of the defendants had been drinking during the day, and had been seen somewhat intoxicated, and had been around the coal sheds aforesaid at different times during the day. A long freight train upon the Northwestern tracks passed south that evening. The train was what is known as a double header, and according to the depot records it left the main depot of the Northwestern Railway at 6:25 p. m., passed the tower house and junction aforesaid one half mile south of the main depot at 6:30 p. m., and proceeded south without stopping. When this train had proceeded south to a point about two thirds of the way up the grade between the coal sheds and the bridge aforesaid, a brakeman upon the train discovered the plaintiff in error, *Lonergan*, lying down upon the roof of one of the freight cars near the head of the train, and appearing to be intoxicated, and the brakeman testified that it was about 6:45 p. m. when he made the discovery. Nothing was then known by the brakeman or any of the train employees of the fact of the commission of the murder.

It does not appear when or where the plaintiff in error left the train, but he was arrested January 1, 1899, and taken to Fond du Lac, and bound over for trial. When arrested he stated that he left Fond du Lac at 4:15 p. m. on the day in question. While in jail it was found that he had secreted in his coat, between the lining and the outside thereof, an account of the shooting of Officer Prinslow as it appeared in the Milwaukee Sentinel on the day after the shooting occurred. This article he tore up when it was found. It also appears that an attempt to break jail was made during his confinement, in which the plaintiff in error appears to have assisted in some degree.

The jury acquitted the defendant Morris, but found the

plaintiff in error guilty.   A motion was made to set aside
the verdict and for a new trial for the reason, among others,
that the verdict was against the evidence and that substan-
tial justice had not been done.    This motion was denied,
and the plaintiff in error was sentenced to imprisonment for
life.

For the plaintiff in error there was a brief by *John C.
Slater*, attorney, and *Murphy & Kroncke*, of counsel, and oral
argument by *Mr. Slater* and *Mr. George Kroncke.*

For the defendant in error there was a brief by the *Attor-
ney General*, and oral argument by *C. E. Buell*, first assistant
attorney general.

WINSLOW, J.   In criminal cases, and especially in a prose-
cution for a capital offense, the defendant has a clear right
to have his guilt determined by the court as well as by the
jury.   " If the verdict does not satisfy the conscience of
the judge, the prisoner is entitled to a new trial."   The ac-
cused has the right to have " the solemn opinion of the judge
who tried the cause, after a careful hearing of all that may be
alleged against its justice, that it ought to stand." *Ohms v.
State*, 49 Wis. 415.   Not only has he this right to the solemn
judgment of the trial judge, but he has also the right upon
writ of error, if the question is properly presented by the
record, to demand the deliberate opinion and judgment of
this court upon the question whether his guilt was suffi-
ciently proven.

Bearing these principles in mind, we have given the evi-
dence very careful consideration, and, after giving to the
verdict and the decision of the trial judge all the weight to
which they are entitled, we are forced to the conclusion that
the guilt of the defendant was not sufficiently proven.

The first serious difficulty is in the matter of the identifi-
cation of the accused.   The assault was committed upon
Seitz after dark, upon a stormy evening.   No one did or

could distinguish the features of the men who made the assault. They immediately fled, and were seen by other witnesses while running away. No one saw the shooting of Prinslow. One witness, named Rockow, saw the three men who assaulted Seitz a few minutes before the assault, standing on the steps of the Chicago, Milwaukee & St. Paul depot, and saw them again running away after the assault. When confronted with the plaintiff in error upon the trial, he testified that he resembled one of the robbers "quite a lot," and upon cross-examination that he resembled him "quite a little." This testimony is really the only testimony which approaches identification of the defendant as one of the robbers. It is plain that such testimony is quite weak on which to base a conviction of murder.

But this is not the most serious difficulty in the case. The fact is that the testimony shows it to have been almost, if not quite, a physical impossibility for the defendant to have been at the place of the shooting and also to have been upon the freight train where he was found by the brakeman. If not an impossibility, at least the unquestioned facts are such that a most serious doubt is thrown upon the claim that he could have been in both places.

The freight train was on the Chicago & Northwestern Railway going south. It left the city depot at 6:25 p. m. This is shown by the entries in the depot record, made by the clerk whose duty it was to keep the record of the departures of trains. This depot was nearly a quarter of a mile west of the scene of the shooting. This train passed the tower house, which is at the junction of the Chicago & Northwestern and Chicago, Milwaukee & St. Paul Railways, at 6:30 p. m. This is shown by the record kept by the operator at that place in the course of his duty, as well as by the oral testimony of the operator himself. The train did not stop at the tower house, but went right on south. This tower house is nearly half a mile south of

Lonergan vs. The State.

the Chicago & Northwestern depot, and nearly, if not quite, half a mile southwest of the place of the shooting. When this train reached a point not less than one mile, and probably nearly two miles, south of the tower house, the accused was found on top of the train, lying down on the fourth or fifth car from the engine. The train was a heavy one and drawn by two engines. All of these facts are undisputed, and in fact were proven by the state. The testimony of the witnesses produced by the state makes it almost a certainty that the shooting took place after 6:30 p. m. The witness Seitz, who was assaulted, places the time of the assault at about 6:30, and the shooting at a few minutes later. Steinbarth, who was talking with Seitz at the time of the assault, places the time at about 6:30. Rockow, the witness before mentioned, says it was between 6:30 and 6:35 when he saw the men at the depot before the assault, and testified that he looked at his watch at the time. Frank Nolan, a policeman, who first reached the scene of the shooting, heard the shots, and testified that they were fired at about 6:40 o'clock. He was in the police station, less than a block away, when they were fired. The only witness in the whole case who placed the shooting before 6:30 was one Race, sixteen years of age, who testified that he thought it was about 6:20; but it does not appear that he had any means of knowledge, and he admits that he might have said that it was "around 6:30" on the preliminary examination.

When we come to the witnesses of the defense, however, all doubt seems to be removed, if any existed before, upon the question as to whether the shooting took place before or after 6:30 o'clock. The witness Haberkorn, who was the operator in charge of the tower house, testifies that he left the tower at 6:32 o'clock; that he looked at the clock as he left; that the train had then passed south; that he went north about four blocks, and then heard the shots fired. This witness is unimpeached, and apparently disinterested and

reliable.   The witness Halpin was a livery man, driving a bus on the night in question.   A train was due at the Wisconsin Central station, about four blocks west of the Chicago, Milwaukee & St. Paul station, at 6:30 p. m., and another one at the St. Paul station at 6:50 p. m.   He desired to make both trains, and he testifies that he left the Central station after the arrival of the Central train, and drove over to the St. Paul station, and just as he was backing up to the platform he heard the first shot, and about two or three minutes afterwards he heard three other shots, and that it was about 6:45 when he heard the final shots.   This witness also seems to be unimpeached and disinterested.   Both of these witnesses have data on which to rest their opinions as to time concerning which there can be little room for doubt. It seems to us that the overwhelming preponderance of the evidence fixes the time of the tragedy at a time not earlier than 6:35, and probably very near to 6:45 o'clock.   A verdict that it occurred prior to 6:35 would be set aside as against the weight of the evidence.

Here, then, is the dilemma: The shooting took place between 6:35 and 6:45 o'clock.   The train upon which the alleged assassin was found about 6:45 o'clock was then probably two miles from the scene of the shooting.   It had passed the tower house, about half a mile from the place of the shooting, at 6:30 o'clock, and had not stopped.   How is it possible that the accused, in his drunken condition, could have got to that train after the shots were fired?   It will not do to say that probably the train was a long one, and that the record of the operator at the tower house means only that the engine had passed, and that the back end of the train may have been half a mile to the rear.   The testimony fails to show how long the train was, and the record and testimony of the tower-house operator are that the train passed at 6:30, that he left the house at 6:32, and that the *train* had passed at that time.   In the face of this uncon-

tradicted and apparently truthful testimony, which fixes the position of the train on which the accused was found at a place where it would have been impossible for him to reach it after the shooting, we cannot approve a verdict which not only says that it was possible, but that he did so beyond a reasonable doubt.

The accused seems to have been a tramp, not a useful or desirable member of society, and doubtless this fact weighed strongly against him in the trial court; but the law throws the same safeguards around him when accused of crime that it does around the most respected citizen. One of those safeguards is that his guilt must be proven beyond a reasonable doubt. In this case suspicion seems to us to have in large degree taken the place of proof. Other evidence may, perhaps, be adduced upon another trial which will explain or avoid the difficulties which stand in the way of a verdict of guilty upon this record, but we cannot speculate upon the possibility of there being such evidence now. Upon the record as it stands, the jury was not justified in finding the accused guilty.

In the view we have taken of the case, we do not find it necessary to discuss the minor questions raised.

*By the Court.*— Judgment reversed, and action remanded for a new trial. The warden of the state prison is directed to deliver the plaintiff in error to the sheriff of Fond du Lac county, who is directed to keep the said *Lonergan* in his custody until discharged therefrom, or until otherwise ordered according to law.