DIETRICH, Plaintiff in error, vs. THE STATE, Defendant in error.

*April 11—May 12, 1925.*

*Adultery: Evidence: Sufficiency.*

The evidence in a prosecution for adultery is *held* insufficient to justify a conviction of the defendant, a married woman, and is considered to raise such a doubt, stronger than a reasonable doubt, that the intercourse was with the consent of the defendant, that her discharge from custody is therefore directed.

ERROR to review a judgment of the municipal court of Milwaukee county: A. C. BACKUS, Judge.   *Reversed.*

The plaintiff in error, hereinafter called the defendant, was found guilty by the court of having on the 24th day of May, 1924, committed adultery with one Ed. Dougherty, and, sentence having been suspended, was placed on proba-tion for a term of three years.   Dougherty pleaded guilty to the information, while the defendant herein pleaded not guilty and signed a written waiver of trial by jury and con-sented to an immediate trial by the court.   When the case was reached for trial on June 3, 1924, the parties stipulated in open court to submit the case upon the testimony taken in the case of *State v. Struck.*

On this appeal the defendant raises as the principal issue the insufficiency of the testimony upon which the conviction was based.   From the testimony of the defendant it appears that she was twenty-five years of age at the time of the trial; was a married woman living in the city of Milwaukee; that a judgment of divorce had been entered in the circuit court for Kenosha county in the month of February, 1924; that only three months had elapsed since the entry of such judg-ment, and that the same had not become absolute and final; that for a period of nine years prior to the trial she had been employed in said city as a lace ironer, and was engaged in such work on each day of the week excepting Sundays and Saturdays for a period of eight hours per day; that on Sat-urdays she worked about four hours; that about three years prior to the trial she had been convicted of disorderly con-duct in the police court of the city and county of Milwaukee and fined $10 and costs; and that with this exception her character was flawless, as far as the record shows, and her reputation good.

That several months prior to the 24th day of May, 1924, she had met one Struck, an unmarried youth of the age of twenty-two years, at a saloon called the Cosy Corner, but that nothing transpired on that occasion which in any man-

ner reflected upon her chastity or her character; that at 8 o'clock in the evening of the 24th of May, 1924, Struck, who had with him in his automobile one Nusslock and one Mueller, called at the place of her residence on Grand avenue in Milwaukee, and, after signaling her with the horn of his automobile to attract her attention, invited her to take a ride with him to the State Fair Park, to which place they intended to drive the other two occupants of the car, one of whom claimed to own some race horses that were there in training. She consented to ride, and occupied the rear seat with Mueller, while Struck drove the car, and Nusslock sat beside him in the front seat. Upon arriving at the park they proceeded to certain barns located on the north end of the park, when the three male occupants left the car and went into the barns, leaving the defendant in the car. One Purcell, who was engaged as an employee in charge of certain horses in the park, then came out of the barn and approached the defendant while she was seated in the automobile, and at once attempted to take certain liberties with her person. To this she protested, informing Purcell that she did not come out for such a purpose; that she was invited by Struck to take an automobile ride; that thereupon she left the automobile and started to run away from her assailant, who pursued her in an effort to have illicit relations with her. While so attempting to escape she screamed at the top of her voice, so loud that it was heard a distance of over one and one-half blocks by a police officer of the city of West Allis, who was patroling Sixty-ninth avenue in said city near the northeast corner of the State Fair Park. At this time Nusslock appeared upon the scene, and he, together with Purcell, muffled her outcries by forcing her fur collar into her mouth; that thereafter they forced her onto the grass, and each in turn had relations with her, she being held down on the ground by the combined efforts of both of the assailants. While these assaults were taking place she struggled and resisted to the extent of her ability, until she became thor-

oughly exhausted. Thereupon she expressed the wish that Struck would take her home in his automobile, and the two assailants thereafter each took hold of one of her arms and forcibly led her to the barns, and when the doors were opened she was forced into a small room which was used for an office and for sleeping quarters. The lights were then turned down and she was forced onto a cot, held down by main strength, and was subjected to sexual relations on four different occasions. She pleaded vehemently to be taken home, and, under the pretext of complying with her wishes, Struck drove her out of the grounds through the south main entrance of the park, over to a saloon situated on the southeast corner of Greenfield and Seventy-third avenues, she sitting in the front seat with Struck, and Purcell and Nusslock occupying the rear seat. On arriving at the saloon Purcell and Nusslock entered, while the defendant and Struck remained in the car. While so seated in the car she implored Struck to hire a cab for her so that she might be taken to her home, she claiming that her condition and appearance were such as to unfit her to take the trip in the street car. Struck then, upon his honor, promised that he would take her home in his car, and he then invited her to enter the saloon with him, with which invitation she complied, with the intention of using a telephone so that she could notify the authorities and also order a cab. On entering the saloon Nusslock and Purcell were standing up at the bar conversing with the proprietor, and she immediately became suspicious that possibly the saloon-keeper might be a good friend and confederate of the three male occupants of the car, and she therefore desisted from using the telephone. However, she testified that she made the statement in the saloon that some one would have to suffer for what had happened to her that night, and that the saloon-keeper replied that whatever happened in the saloon he would be responsible for, but that he was not responsible for what happened outside of his place of business. The defendant then again

pleaded for a cab, and Struck insisted that he would take her home. While in the saloon a drink of soda was placed before her, which she claims she refused to drink.

Thereafter the four parties left the saloon and entered the automobile, and Struck, instead of driving easterly in the direction of the city of Milwaukee and of defendant's home, turned the car to the west, away from said city and out towards the country. While the car was being driven in a westerly direction the defendant, fearing that the male occupants of the car had planned further illegal assaults, attempted to shut off the ignition in order to stop the car, but Struck assured her that they would drive her directly home. Instead, however, they proceeded west on Greenfield avenue from Seventy-third to Eighty-ninth avenue, a distance of sixteen blocks, and then turned the car towards the north into a dark dirt road. While proceeding on this road she again implored Struck to turn around and drive her to her home. Struck again assured her that this was what he was endeavoring to do. At that time her attention was attracted to a conversation which she was unable to overhear, conducted by Nusslock and Purcell upon the rear seat, and while they were passing the house of an elderly lady by the name of Peterson, a total stranger to the defendant, she, noticing lights in the house, suddenly jumped from the moving automobile and was precipitated onto the ground with such violence that she dislocated her shoulder. She arose from the ground and ran to the house, while Struck stopped the automobile and the occupants alighted, pursuing her, but before they could reach her she had rapped at the door and was admitted to the house by Mrs. Peterson. Struck, Nusslock, and Purcell then returned to the machine and disappeared and were not seen again until they were subsequently apprehended by the police officers of the city of West Allis.

While in the house the defendant complained of great pain in her right shoulder, and she also made complaint of what

had transpired during the evening. During this time a son of Mrs. Peterson, who lived a distance of about one hundred feet from her, seeing lights burning at that hour of the night and being apprehensive that the mother had failed to turn out the lights before retiring, appeared upon the scene, and then at that time the defendant again made the complaints that she had made to the mother. The son then took the defendant to his home, telephoned to the police headquarters in the city of West Allis, and ordered an ambulance, and defendant was then taken to the West Allis station, where she again repeated the incidents related to the Petersons and also received medical attention.

After midnight the defendant was taken by the police officers to the barns upon the State Fair Park, where several of the participants in the affair were identified by her, were placed under arrest and taken to the station. Thereafter she accompanied the police officers to the city of Milwaukee, where the remaining offenders were identified and were also placed under arrest and taken to the station. The defendant herein was permitted to return to her home, and was requested to report at the station the following morning, and at that time all of the parties were taken to the office of the district attorney of the county of Milwaukee, where they were interrogated and made statements, and warrants were then issued against this defendant and several of her male companions upon complaints charging adultery.

Struck, Purcell, Nusslock, and Dougherty each admitted that they had relations with the defendant, and all claimed that she submitted voluntarily, and that she at no time made a protest. Struck admitted that when he first called on her he invited her out to take a ride, stating that one of the members of the party had horses out at the fair grounds. The male members who accompanied her from her home all testified that while driving to the fair grounds a discussion was had with the defendant upon the subject of compensation to be paid her. Mueller testified that she suggested $5;

Purcell testified that before he had relations with her she fixed the price at $5, and that when they entered the saloon he borrowed $5 from the saloon-keeper, and as they were leaving the saloon he paid her $2. Nusslock testified that in the barn he offered her $1, but that she wanted $10; that he claimed that it was $10, and that she returned the money to him. Dougherty testified that he wanted to pay her; that she wanted $5, and that he offered her a $10 bill, but she could not make the change.

There is no evidence in the case that any of the parties were under the influence of liquor excepting Mueller. The testimony also shows that all of the male companions made substantially the same statements to the police officers at the West Allis station and to the district attorney as they made on the trial.

Further facts will be referred to in the opinion.

*Edward J. Burke* of Milwaukee, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, Eugene Wengert,* district attorney of Milwaukee county, *George A. Bowman,* special assistant district attorney, and *C. Stanley Perry,* assistant district attorney, and oral argument by *Mr. Bowman.*

DOERFLER, J. A careful examination of the evidence submitted in the case leaves with us a strong conviction that the defendant at no time consented to the illicit relations above referred to. The defendant, while she did not possess a spotless character, was far from being a prostitute. She was a hard-working and industrious woman, who worked at her trade for eight hours and over every working day of the week excepting Saturdays. She enjoyed a good reputation with her employer and with her landlord. Nothing derogatory to her character was adduced in the evidence with the exception that it appears that several years prior to the trial she had been arrested for disorderly conduct and fined $10 and costs. This is far from establishing for her

the character of that of a common prostitute, and no one would voluntarily submit to such treatment as the evidence shows the defendant was submitted to unless she had sunk to the level of a common prostitute. She was not picked up on the street or in a house of ill-fame or in a place of questionable character, but from her home. She was called to the automobile by Struck, whom she had met on a prior occasion, but with whom she had had no illicit or immoral relations. She was induced to take this trip by Struck upon the pretext that he was taking his male companions to the fair grounds, where one of them had some race horses in training. The hour of the night was not unseasonable, and from all the surrounding facts and circumstances it cannot be inferred that she had any notion whatsoever of entering into immoral relations with either Struck or any of his companions. Struck did not testify that before the trip he had heard her reputation spoken of as being questionable, and his testimony upon the stand where he stated that immediately upon inviting her for the trip he said to her that he would make it all right with her, meaning, as he stated, that they would pay for whatever they got, is highly incredible and improbable. This can also be said with reference to evidence given by Nusslock and Mueller to the effect that while proceeding to the park they discussed the question of consideration for the proposed illegal acts.

One thing stands as an admitted fact in this case, which is undisputed, and which stamps the testimony of Struck, Nusslock, and Dougherty, where they assert that prior arrangements had been made for the intercourse for money consideration, highly improbable and incredible, and that is that the defendant at the time was having her regular monthly period. Characters like the male members of the party involved in this unsavory expedition that would take advantage of a woman under such circumstances are not worthy of much credence. If there is a time in a woman's life when sexual relations are repulsive it is during such a

period. It is therefore rational to assume that the defendant resisted with all her might and main. She screamed at the top of her voice, so that her outcry could be heard by a West Allis patrolman a distance of over a block and a half away. This is a corroboration on which the learned district attorney places little reliance, and yet the patrolman testified upon the subject and said that he made every effort to ascertain the source from whence the cry emanated but was unsuccessful. Her further outcries were muffled by the application of a gag.

This is not a case where it is claimed that a female was forced into submission by the efforts of a single male; on the contrary, the force of all of them was exerted in order to subdue the one assaulted. The State Fair grounds are located near the northwest limits of the city of West Allis. The grounds are inhabited only by the keeper and by those who are there necessarily in attendance on whatever stock may be then there kept. The assaults took place at the north end of the grounds, a considerable distance from any human habitation.

It is rather strikingly significant that all of these male assailants testified that the subject of pay was discussed during the entire period from the time that they left defendant's home up to the time that they arrived at the saloon, but that no money consideration passed, according to their testimony, excepting the $2 which Purcell claimed he paid her as they were passing out of the saloon. Purcell claims that his object in visiting the saloon was to borrow sufficient money so that he could square himself with the defendant, and that, having obtained the money, he paid the $2 as above stated. In his testimony he referred to the saloon-keeper as being present in the court room and as being able to testify to his borrowing the money and to his passing the $2 over to the defendant, but the saloon-keeper was not called upon the stand and did not testify upon the subject. Defendant testified that money was offered her at the fair grounds but

that she refused it, and that no money was offered or paid to her while at the saloon.

Before entering the saloon with Struck defendant implored him to order a cab for her. This was admitted by Struck. She also offered to go to a near-by garage to telephone for a cab, because she claimed that her condition and her appearance were such as to make her an unfit passenger upon a street car. She desisted from doing this upon the promise of Struck to take her home. When they left the saloon, instead of traveling east on Greenfield avenue they turned towards the west. It is true that one of the police officers testified that between Forty-eighth and Fifty-first avenues the street was rather rough, but there was no testimony to the effect that it was unfit for travel. There is no evidence in the case that there are no other crossroads leading off from Greenfield avenue to the north connecting with the Blue Mound road, which is an extension of Grand avenue in the city of Milwaukee. Struck testified that on turning west from the saloon he proceeded a distance of but a block or a block and a half. It was definitely established on the trial that the machine was driven as far as Eighty-ninth avenue, a distance of over a mile west of Seventy-third avenue, where the saloon was located. Struck also admits that the defendant interfered with the ignition in an effort to stop the machine and to induce him to turn about and take the defendant home. Her protests were in vain, and the machine traveled on until it reached a side dirt road leading in a northerly direction from Greenfield avenue. Arriving upon this road the occupants in the rear seat of the automobile were having a secret conference, and in view of this fact and of all the other facts and circumstances in the case the defendant became so fearful that she would either be the subject of continued assaults or of some other atrocious acts that she jumped from the machine while it was in motion and sought refuge in the home of the aged Mrs. Peterson, who still had her lights burning at that time. The male

occupants stopped the machine and alighted and pursued her, evidently with the intention of persuading her not to sound the alarm, but before they could succeed in their efforts she had rapped at the door and was admitted into the house. On jumping from the machine she fell with such violence on the street that she dislocated her shoulder. The male companions were not interested to ascertain whether or not she had been injured; they did not accompany her into the house in order to make explanations or to justify their conduct. They acted in accordance with a guilty conscience and skulked away in the dead of night, leaving this young woman far out in the country among perfect strangers.

In all violent assaults of this nature the immediate report of the occurrence to the authorities or others has an important and significant bearing in establishing the truth of the charge of the assaulted person. She not only explained to Mrs. Peterson and her son the cause of her injury but the abuse to which she was subjected. She was present when the son telephoned to the police authorities of the city of West Allis and made no protest, indicating clearly that she had no fear of any guilt on her part. She repeated the occurrence in detail to the officers at the station and did likewise to the district attorney.

The following excerpt from the testimony reveals the conscience of Struck with respect to the entire transaction. This evidence refers to the time when the defendant jumped from the moving machine:

*Q.* She jumped out of the machine when it was going? *A.* When it was going north.

*Q.* And she rushed towards the house where she saw the light, didn't she? *A.* Yes, sir.

*Q.* Did you follow her? *A.* We went back after her.

*Q.* Why didn't you go in that house? *A.* You never can tell what will happen—they might shoot you or something like that.

*Q.* What were you afraid of if you were protecting this woman? *A.* You hear of funny things happening like that,

you can't tell they might act like you hear cases where they were shot and all that.

*Q.* Then you were afraid of being shot? *A.* Yes.

It would serve no useful purpose to go into the evidence in greater detail. Suffice it to say that there are outstanding facts and circumstances in this case which are undisputed and which speak louder than words or testimony coming from the lips of witnesses, and these strongly corroborate the defendant's version of what transpired. Assuming that the cry that the police officer heard shortly after the parties arrived at the State Fair Park was one emanating from some other person, it must be admitted that these assailants had the strength and the power to subdue the defendant and to cause her to submit to their desires if that was their object and aim. That force was actually used is demonstrated beyond question. The defendant had discoloration marks on both of her knees and on her hip. Her shoes and stockings were bespattered with mud and discolored from the grass. Her clothing was partially torn and muddy. Her hat was crushed and begrimed with mud. She was an unfit subject to travel in a street car, and she not only endeavored to secure a cab by her own efforts but pleaded with Struck to order one for her. She interfered with the ignition in order to induce the driver of the machine to turn about and head for the city of Milwaukee. She jumped out of a moving automobile at a lonely spot in a country road and appealed to perfect strangers for help and assistance. She related her story to strangers, and consented to bringing matters to the attention of the public authorities, and she made a full and candid statement both before the police officers of the city of West Allis and the district attorney of the county. There is little more, as we see it, that she could have done under the circumstances. Had she participated in this affair voluntarily, we must assume that she realized that she was a participant in crime, and that in itself would have had a tendency to have sealed her lips and have persuaded her from making

known to the public authorities her own criminal acts.    A careful review of the evidence and a painstaking consideration of the same leaves in our mind not only a reasonable doubt of her guilt, but an abiding conviction that her statements are true.

In the brief of the learned district attorney the following passage appears: "Counsel for the plaintiff in error has set forth in his brief in considerable detail, both in his statement of facts and argument, *Dorothy Dietrich's* testimony, which if believed would show a most pitiable picture of forcible rape."    We heartily indorse this statement, and we will add that her testimony impresses us as being true.    No more serious offense can be committed on a female than that of rape.    Murder results in the death of the victim.    It ends all suffering, and he is free from future humiliation, remorse, regret, or reproach.    But a female who is the victim of a ravisher is bound to go through life with a stain upon her character, and she is the subject of idle and malicious gossip for the rest of her days, and unthinking mankind points at her the finger of shame and of scorn.    No case coming before a court requires a more thorough and conscientious investigation and consideration.    To say that we are pained by the meager testimony submitted on this very important case but weakly expresses our convictions.    Many important facts and circumstances which should have been elicited upon the direct and cross-examination of the witnesses were left either wholly untouched or but partially inquired into.    The exact location of the fair grounds, for instance; the various roads leading from West Allis to Milwaukee which might have been available to Struck; the conversations which took place while driving from the home of the defendant to the fair grounds and from the fair grounds to Eighty-ninth avenue.    No medical expert was called who had made an examination of the body of the defendant, although the arrest followed close upon the heels of the entire episode; nor was there a microscopic examination of the defendant's

apparel to demonstrate that the blood oozing from her at the time came as the result of her monthly periods.   In its importance to the community the offense which the defendant claimed was committed upon her is equaled, if at all, by the crime of murder.   We have expressed our approval in the case of *Magnuson v. State,* reported herewith (*ante,* p. 122, 203 N. W. 749), of the highly scientific and enlightened experiments resorted to in order to prove the defendant's guilt in that case.   The case last referred to sets a standard which it would be well for all prosecuting attorneys in important criminal cases to emulate.

In *Lonergan v. State,* 111 Wis. 453, 456, 87 N. W. 455, Justice WINSLOW in the opinion uses this language:

"Not only has he [the defendant] this right to the solemn judgment of the trial judge, but he has also the right upon writ of error, if the question is properly presented by the record, to demand the deliberate opinion and judgment of this court upon, the question whether his guilt was sufficiently proven."

Viewing this record carefully, conscientiously, and impartially, we are convinced that it does not justify a conviction, and that it presents beyond controversy not only a reasonable doubt, but a strong, "robust" doubt, stronger than a reasonable doubt, which leads us to the conclusion that the judgment and sentence of the lower court should be reversed and that the defendant should be discharged.

*By the Court.*—It is so ordered.