HAMILTON, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 14—March 9, 1920.*

*Criminal law: Homicide: Evidence: Reports of proceedings on a conviction of felony in another state: Proof of conviction of felony: Hearsay: Proof of identity: New trial: Newly discovered evidence: Reversal.*

1. In a prosecution for murder it was improper to introduce in evidence the decision of the supreme court of another state discharging defendant from imprisonment on a conviction of felony in such state, where the conviction referred to was admitted by defendant on the trial, a former conviction being competent evidence only under sec. 4073, Stats., as affecting credibility, and provable only by cross-examination of the defendant or by the record.

2. Where the identification of the accused as the person seen leaving the place of the homicide was in issue, statements of police officers as to what a witness had said relative to the identity of the accused are hearsay and incompetent.

3. Where there is no direct evidence that the defendant committed the crime, except the identification of him as the person seen leaving the place of the homicide, made by a fourteen-year-old boy who is not positive in his testimony, the fact that the defendant made false statements in reference to his residence, his movements on the night of the crime, and other details, and that a fellow prisoner in the jail in which he was held awaiting trial testified that he overheard the defendant admit the crime while at prayer, does not justify a conviction beyond all reasonable doubt.

4. In this case, where the evidence as to the identity of the person who committed the crime is unsatisfactory and it is alleged that there is newly discovered evidence on this issue which is important, and the supreme court under sec. 2405m, Stats., cannot say that all the evidence was before the jury and that upon the record justice has been done, a new trial will be ordered.

5. A person convicted of crime has a right to demand the solemn judgment of the supreme court as well as that of the trial court as to whether his guilt was sufficiently proved.

ERROR to review a judgment of the circuit court for Racine county: E. B. BELDEN, Circuit Judge. *Reversed.*

The plaintiff in error was charged in the information

with murder in the first degree of Edward Warner, at Racine, Wisconsin, on December 15, 1917. There were no actual eye-witnesses to the murder, which took place about 7:15 p. m. in a Standard Oil filling station at the intersection of Seventh and Main streets in the city of Racine. A fourteen-year-old boy named Mervil Peil, who was on the sidewalk of the street opposite the oil station, saw the murderer as he ran from the oil station to the sidewalk in front of the station, then north until he disappeared. The boy picked out *Hamilton* as "the man who resembled him most" from about a half dozen other men at the police station that evening. The identification was not positive, the boy asserting that "his (*Hamilton's*) height was about the same, and his dress, and the build of the man." The boy also stated that he could see how the man was dressed: "He had a short knee coat on, and a flat top cap with rounded sides, and he had his coat collar turned up and his ear-laps down."

The state also introduced testimony at the trial to show that a fellow prisoner of *Hamilton's* heard him praying at night in the jail and caught the words: "Oh, God, why did I kill this man? Oh, God, forgive me." It was also proved that *Hamilton* had at one time been known as Eli J. Long, and that he had been convicted in Michigan on July 2, 1908, of attempting to commit the crime of murder. *Hamilton* swears that on the evening of December 15, 1917, he left his home and rode on a jitney bus to the Racine Hotel; that he went directly from there to the postoffice; that while in the postoffice a boy crowded ahead of him in the line and told the postmaster of the firing of two shots at the filling station and another as the man came out. The boy was identified as Mervil Peil by defendant, and *Hamilton* claims that he first heard of the shooting from the conversation between this boy and the man at the postoffice window.

The case was submitted to the jury. The jury returned a verdict of guilty. On April 26, 1918, a motion for arrest of judgment and for a new trial was made upon affidavits

Hamilton v. State, 171 Wis. 203.

of defendant and his attorney to the effect that counsel had not learned until after the trial of the facts that the turnkey at the jail where defendant was confined, and two inmates, had personal knowledge that defendant's cell door was closed on the night when the witness Larsen testified that it was open and that he heard the declarations of the defendant while praying. The court overruled this motion for want of a proper showing of diligence. On May 3, 1919, a motion was presented to the trial court in defendant's behalf for a new trial upon the grounds of newly discovered evidence and that upon the whole record the evidence was not sufficient to sustain a conviction and imprisonment of defendant. The alleged newly discovered evidence is to the effect that Gertrude Gressing, aged twenty years, and Marion Gressing, an older sister, were at the time of the shooting at the oil station walking north on the opposite side from the station on East Main street; that immediately after the shooting they saw a man come out of the oil station and walk westerly; that they observed him and the garments he wore; that on the same evening about 10 o'clock, at the request of the police, they took the same position on the street from where they had witnessed the man leave the oil station after the shooting, and watched a man accompanied by the police walk from the oil station in the same direction they had seen the man go immediately after the shooting; that in their opinion the man accompanied by the police was not the man they saw immediately after the shooting. The man "accompanied by the police" was *Hamilton,* the defendant.

Defendant's counsel, Ahrens, states that he did not know of this evidence until April 5, 1919. It appears that the Racine newspapers referred to and published the fact that the Gressing sisters heard the shooting and saw the man as related above, and that the public generally heard of this fact and generally discussed it. The trial court held that the facts and circumstances disclosed by the affidavits in

support of the motion and the facts disclosed on the trial did not show due diligence and that, if this alleged newly discovered evidence were produced and submitted to the jury in connection with the evidence in the record, there is no reasonable probability that a different verdict would result; also that the court was of the opinion that justice had been done in the case. The motion was denied.

The plaintiff in error, herein called the defendant, urges that the court erred in (1) permitting the state to introduce in evidence the case published in 154 N. W. 567, concerning defendant's discharge by a decision of the supreme court of Michigan from a conviction on a charge of felony, the defendant having admitted this in open court; (2) receiving hearsay evidence of two police officers in testifying to the description Mervin Peil gave them at the police station, after seeing defendant and others in the station, as the man whose appearance and clothing looked like those of the man he had seen come out of the oil house immediately after the shooting; (3) refusing to grant a new trial on the grounds of newly discovered evidence. The defendant also urges that justice has not been done in adjudging him guilty, because the evidence in the case does not support the conviction.

*Wallace Ingalls* of Racine, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *J. E. Messerschmidt*, assistant attorney general, and oral argument by *Mr. Messerschmidt*.

SIEBECKER, J. The introduction of the case as printed in vol. 154 N. W. Rep., pertaining to the decision of the supreme court of Michigan discharging the defendant from imprisonment for a conviction of a felony, was improper, since such conviction was admitted on the trial. His former conviction is competent evidence only under sec. 4073, Stats., and such conviction can only be proven by his own cross-examination or by the record. It being admitted on the

Hamilton v. State, 171 Wis. 203.

record that he had been convicted and discharged on *habeas corpus* proceedings, it is readily perceived how the printed case of the proceeding in the Michigan supreme court might be the source of prejudicial inference where the identity of the person who did the shooting at the oil house was the grave and important issue on trial.

It is urged that the court erred in receiving the testimony of officers Yanne and Harms, who testified to a description Mervil Peil gave them of the man he saw leaving the oil house. True, this evidence was not objected to, but it is proper to be considered in connection with the other evidence in the case on the question raised whether or not the competent evidence in the case sustains the conviction beyond a reasonable doubt.

The all-important inquiry for determination by the jury was the fact of identifying *Hamilton* as the man who came out of the oil house immediately after the shooting. On this point the record rests on the evidence of the boy Mervil Peil. The evidence of these officers is but a repetition of what Peil stated to them. This kind of evidence has been held to be hearsay and incompetent. *O'Toole v. State,* 105 Wis. 18, 80 N. W. 915; *Gillotti v. State,* 135 Wis. 634, 116 N. W. 252.

Under the circumstances of the case it is most likely that it was given much weight by the jury to corroborate the testimony of Peil. A study of the testimony of Mervil Peil discloses that he at no time expressed a positive conviction that the defendant is the man he saw coming out of the oil house immediately after he heard the shooting. He gave the following description of his appearance by which to identify him: "I could see how he was dressed; he had a short knee coat on, and flat-topped cap with rounded sides, and he had his coat collar turned up and his ear-laps down." He states that he could not see the man below the knees because of a snow bank about two feet high. After viewing the man in this manner the boy started hurriedly to re-

port the occurrence to the police without another view of the man at that time.    Later in the evening, after the defendant had been arrested and was exhibited to Peil with a number of other men at the police station, Peil states he was asked by the police, referring to the men before him, "What man he saw running away from the filling station?"    On the trial he was asked the question, "How was the defendant dressed that night at the police station?"    Answer: "Well, he had a coat on, a cap with rounded sides, a flat-topped cap, and he had also khaki pants and leggings on—and overcoat up about to his knees."    In answer to a question if he saw any one at the police station "dressed similar to the man" whom he saw leaving the oil house he answered: "Well, *Mr. Hamilton* was the only man that looked something like him. He was the only man that was dressed mostly like him that left the filling station."    This is as near as Peil could identify the man he saw coming from the oil house at the time and occasion.    The testimony of the witness Larsen, who was confined to the jail and occupied a cell opening on the same aisle as did defendant's cell, is that the cells were left open one night in March and that about midnight, while he walked in the aisle, he heard defendant praying for about ten minutes or so in indistinct speech and understood defendant to say "Oh, God, why did I kill this man?    Oh, God, forgive me;" that he did not see the defendant at the time he heard the words, nor could he tell whether or not he was asleep.    All the other evidence in the case consists of circumstances surrounding the shooting, facts and incidents of the defendant's life, his whereabouts on the evening of the murder, his conduct when arrested and when subject to identification by the police on the same evening.    The state, in addition to the foregoing testimony, lays stress on the impeachment of defendant's testimony by his former conviction and many contradictions on the witness stand. The state also urges that the following facts elicited on the trial showing falsification by defendant tend to prove that

*Hamilton* was the man who committed the murder: that he gave his name when arrested as Eli J. Long, when in fact he lived in Racine under the name of *George E. Hamilton;* that he testified at length that his real name is Eli J. Long and that he changed it to *Hamilton,* but that in 1917 he again changed it to Long; that he falsified as to how he traveled in going from his residence to the postoffice on the evening in question; as to the places he had resided in Racine before this evening; as to the treatment of him by police officers after his arrest and before being released on the evening of the shooting; about carrying money in his sock on the evening of the shooting.

We have searched the evidence and there is no evidence of direct proof that defendant is the man who fired the shots that killed Warner, except the testimony of Peil as above stated. True, the evidence pointed out by the state as tending to show that defendant made false statements in the respects referred to may have been considered by the jury as tending to indicate guilt, but even in this view of the case it is not sufficient, in connection with Peil's and Larsen's testimony, to remove from our minds the impression that it lacks convincing power, and has not the probative weight to justify defendant's conviction beyond all reasonable doubt. Furthermore, the testimony of the Gressing sisters as exhibited by the affidavit on the motion for a new trial for newly discovered evidence is important in view of the unsatisfactory state of the evidence on the subject of defendant's identification. Under the broad powers conferred on this court by sec. 2405m, Stats., we find it impossible to say that the evidence on the main controversy was all before the jury and that upon the record before us we are satisfied that justice has been done by the conviction of the defendant.

As declared in *Gerke v. State,* 151 Wis. 495, 139 N. W. 404, a person convicted of a crime has the right to demand the solemn judgment of this court as well as that of the trial

court as to whether his guilt was sufficiently proven.    See, also, *Lonergan v. State,* 111 Wis. 453, 87 N. W. 455; *Koscak v. State,* 160 Wis. 255, 152 N. W. 181; *Kuhl v. State,* 167 Wis. 495, 167 N. W. 743.

*By the Court.*—The judgment of the circuit court is reversed, and the action remanded for a new trial.    The warden of the state prison will deliver the plaintiff in error into the custody of the sheriff of Racine county, who will hold him in custody to await the further order of the court.