STATE, Respondent, v. DUNN, Appellant.

*April 8—May 3, 1960.*

For the appellant there was a brief by *Nathan J. Rakita* of Milwaukee, attorney, and *James D'Amato* and *Robert T. McGraw,* both of Waukesha, of counsel, and oral argument by *Mr. McGraw* and *Mr. D'Amato.*

For the respondent the cause was argued by *John H. Bowers,* assistant attorney general, and *William F. Reilly,* assistant district attorney of Waukesha county, with whom on the brief were *John W. Reynolds,* attorney general, *William A. Platz,* assistant attorney general, and *George E. Lawler,* district attorney of Waukesha county.

MARTIN, C. J.   The Dunn and Pfeiffer families had been friends for about four years previous to August 14, 1959. In July of 1958, the two couples went on a vacation trip together. For over a year prior to August 14, 1959, Dunn and Mrs. Pfeiffer had been in love and carried on an illicit affair, unknown to their spouses.

The following letters from Dunn to Mrs. Pfeiffer are in evidence:

"My Darling Marge:

"This is a something, I rarely do is write a letter, However, here goes.

"Our problems are mutual and time and patience will be our reward. Although there is a superstitious one on this end there has not been any comments regarding the two of us.

"With reference to talking in my sleep, I don't think we have to worry as I am sure anything I may have said would have come out already.

"Your note recently was most heartwarming although worry will not help either of us—whatever is to be will be.

"Please remember I can do no good away from you if any accidents happen that would separate us for any length of time. I fully realize this and will always have that in my mind.

"With our personal feelings being very hard to control, I will always put our togetherness ahead of everything else.

"Our relationship has gone beyond friendship and it is still my intention of securing you. (By hook or crook.) Two individuals as us have acquired something many, many people look, think, and maybe acquire. This is my feeling, otherwise I would not put it in writing.

"I do believe that if I can beg forgiveness of you and control myself in your presence allowing someone to think and then—Bingo—Pull a surprise element our chances would be better and quicker.

"I will say this that if you have to move in with your mother-in-law that would be your opportunity to rebel and start your end of things. If you should start, use our finances. If not enough please let me know and I will acquire some more somehow.

"If we both would do something at the same time, the cat would be out of the bag. $2 + 2 = 4$. Hope you understand if not I will explain to you when I see soon.

"I am asking questions here as to whether or not anybody has been informed about us. The reply has been negative.

"She thinks without saying, this is a passing fancy of mine. I am very happy to hear this guarded comment.

"I hope you do not think so. My faith in you far surpasses any doubts.

"You have done something to me she could not do in twenty years. Given me something to look forward to. And after I acquire you, the moments left for us will be cherished ones.

"I received another compliment about you and you're lovely blue dress. We were round dancing when we were seen together and the comment made by a nonsquare dancer was the perfect ease at which we did the dance. We were made for each other. As I hear these things I am not trying to raise my ego or get you flustered, but rather to prove to you that only time & patience will pay off.

"Whoops, Here they come—3:30 p. m.—Have now retired to the library 12:45 p. m.

"I was not in Oconomowoc regardless of what Rex says. He must have been mistaken.

"With reference to letters or memos being left around I don't think she has done anything like that. I don't think she ever thought of such a thing.

"Also do not worry about the children. They have no knowledge of anything irregular between her and myself. I go so far and no further.

"Well, Darling this has been a real happy chore.

"Have faith, we'll win.

"Love<br>
"Ed."

"11–16–58

"My Darling Marge:

"I goofed Saturday by coming home and laid down and fell asleep in the front room. My intentions were to go back to the shop and call you.

"What I have to say now is awfully hard to say. So before you read too far count 10—

"Last Thursday you made me very jealous, naturally, I now have something to be jealous about and that was this other guy pestering you. I don't like it. I am sorry if I

have offended you, but that is the way I feel. You'll find it out sooner or later so I might just as well tell you now Darling, I can't help it.

"Again, patience will be our reward. I realize patience can run out but don't let it and the thing or end we are working for will be destroyed.

"Please add it to OUR fund that we will be needing.

"I Miss You!

"I Need You!

"I Love You!

"Yours,
"Ed.

"P. S. Don't mind my drinking. I am trying to start something.

"Ed."

On the morning of August 14th, Dunn telephoned Mrs. Pfeiffer and arranged to meet her at a trailer court outside the city of Oconomowoc at 9 that evening. She met him as planned and took him in her car to the Pfeiffer home at 652 Roland avenue, Oconomowoc, arriving there at approximately 9:30. She left Dunn in the back seat of the car and went into the house. Mr. Pfeiffer was at home watching a football game on television. They decided they were hungry and Pfeiffer said he would go out for a couple of sundaes during the half time of the game. He left the house at 10. Pfeiffer testified:

"I went out to the car, rolled down the window, put the key in the ignition. The car has not been starting too good lately. Went to start the car, all of a sudden I felt this object come over my face. At first I thought it was just a cobweb or something. A voice said, 'This is all for you, bud.' I turned around and struggled with a party in the back seat. I at first thought it was some drunk that had picked my car to sleep it off in. Things got rough as we exchanged a few blows. I dove out of the window of the front door, looked back at the party in the front seat, went toward the road.

Then he got out of the car. I said 'what the heck's the matter with you, Ed?' He said, 'I'm sorry, I guess I went off my rocker for a minute,' then he walked toward the garage and went off, and that was it."

When his assailant got out of the car he recognized him as Dunn. Dunn was wearing a blue slack suit and a pair of bright-blue gloves. Pfeiffer went into the house and called the police. His injuries were a cut across the bridge of his nose, a black-and-blue spot on the left cheek and a slight mark around his neck.

Police Officers Braatz and Koloske arrived "a very few minutes" after the call, Pfeiffer testified, and he told them what happened and identified his assailant as Edward Dunn. At Pfeiffer's suggestion, they went out to look at the car and found two pieces of wire on the floor in the back seat. Pfeiffer made another inspection of the car the following morning when he found that the dome light had been removed, the bulb and cover lying on the floor in the back seat.

Pfeiffer testified he and his wife were separated from the middle of July to August 8, 1959, because of marital difficulties, but he did not know of the relationship between Dunn and his wife until after the incident of August 14, 1959.

He testified that the fight he had with Dunn in the car was not "vicious," and that there were probably not more than 10 or 12 blows struck; that he did not at that time feel that his life was in danger. He testified:

"I came to that conclusion when I went into the house, that my life was in danger but maybe that would be anybody's thinking after you come in and are kind of bloody."

Defendant was arrested by the Milwaukee police on the early morning of August 15, 1959, upon a fugitive complaint from the Oconomowoc police department for "aggravated

battery." He was taken to Waukesha, charged with attempted murder, entered a plea of not guilty and was tried on that charge.

Before considering the questions raised by the defendant, we may say that the state contends that no motion for a new trial was made in the trial court. It appears by stipulation, however, that defendant made a motion for a new trial but through inadvertence it was omitted from the bill of exceptions; it was later sent on to this court.

Defendant's first contention is that there is no evidence to show any intent on his part to strangle Pfeiffer; that the only testimony to that effect is by Police Officers Braatz and Hollatz, which was hearsay and not a part of the *res gestae*. The state claims that the evidence in question is part of the *res gestae* and we hold that it is. See 24 NACCA Law Journal, p. 123 *et seq.* The rule has been stated as follows:

"In discussing the subject of *res gestae,* it is said in 3 Wigmore, Evidence (1st ed.), at sec. 1746, that 'the typical case presented is a statement or exclamation, by an injured person, immediately after the injury, declaring the circumstances of the injury, or by a person present at an affray, a railroad collision, or other exciting occasion, asserting the circumstances of it as observed by him.' And in sec. 1749: 'The utterance, it is commonly said, must be "spontaneous," "natural," "impulsive," "instinctive," "generated by an excited feeling which extends without let or breakdown from the moment of the event they illustrate." ' And in sec. 1750: 'There must be some shock, startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting. . . . The utterance must have been before there has been time to contrive and misrepresent, *i.e.,* while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance.' The decisions of this court upon the subject are in harmony with this statement of the principle upon which the doctrine of *res gestae* is based. [Citing cases.]" *Kressin v. Chicago*

*& N. W. R. Co.* (1928), 194 Wis. 480, 485, 215 N. W. 908.

Hollatz testified he was on duty at the police-department office at Oconomowoc on the night of August 14, 1959, and—

". . . I received a telephone call. Party stated that he wanted a squad car at 652 Roland avenue as someone tried to strangle him in his car."

This was admitted over the objection of defendant's counsel on the ground it was hearsay. The court further admitted, over objection, the notation which Hollatz entered in the log book as follows:

"10:03 p. m., 8–14–59. Received a call from a party at 652 Roland avenue that someone attempted to strangle him when he got into his car. Squad No. 24, Officers Braatz and Koloske on call."

Hollatz testified he did not know who made the call but the man was excited and wanted a squad car right away.

Officer Braatz testified he was on duty at about 10 p. m. on August 14, 1959, and was given the assignment "To proceed to 652 Roland avenue, that a party called and stated somebody tried to strangle him in his car." This was admitted over objection. Braatz testified that he and Officer Koloske proceeded immediately to 652 Roland avenue, arriving there at approximately 10:05, and when the officers entered the living room, "Clyde came out of the kitchen with a cloth around his neck; . . . He had a cut on his nose and the back of his neck and his back was all red as if it was bruised, and *he was very excited;*" that he had a conversation with Clyde Pfeiffer and—

"*A.* He told me that his wife had asked him to go get some custard and when he went out to the car, car started a little hard and in the process of trying to start the car he

felt something come over his face, what he thought was a piece of wire but he wasn't sure, and he thought somebody was trying to strangle him. He struggled with this party and in the process he turned around and said, 'For Christ's sake what are you doing?' and the wire broke. He climbed out of the window which was open and he said Mr. Dunn got out of the car and said, 'Gee, Clyde, I'm sorry, I must have cracked up for a minute.' He started north between the house and garage."

Thereafter the officer testified they went out to inspect the car and—

"When I got alongside of the car I shined my light in the back window on the back seat and noticed wire laying on the back seat of the car. Before I had a chance to open the car, Mr. Pfeiffer opened the car door, reached inside, pulled out a long piece of wire and said, 'See, it was wire,' and handed it to Officer Koloske."

There was no objection to this testimony.

Pfeiffer testified he looked at the clock as he left the house; it was 10 p. m.; that he called the Oconomowoc police department as soon as he returned to the house after the fight in the car. The call to the police department was entered in the log book at 10:03 p. m. While Hollatz did not know it was Pfeiffer who called, he testified the man was excited and stated that "someone tried to strangle him in his car" and wanted a squad car to come immediately to 652 Roland avenue, which was the address of the Pfeiffer home. That it was Pfeiffer's call which Hollatz took and reported in the log book is not only a proper but a compelling inference. At approximately 10:05, Braatz and Koloske arrived at the Pfeiffer home. Braatz testified Pfeiffer was very excited when he talked with him.

Referring to Pfeiffer's testimony that during the struggle he did not feel his life was in danger but "came to that

conclusion" when he went into the house, defendant argues that Pfeiffer's statements to the police officers to the effect that an attempt was made to strangle him and that it was done with a wire constituted a conclusion reached by him after reflection and thus do not qualify as part of *res gestae*. As shown by the evidence summarized above, the statements were made while in a state of excitement and within three and five minutes after the struggle took place. The trial court, who heard Pfeiffer's testimony, stated:

"It seemed perfectly logical to me that it took a few minutes for realization of what happened to dawn on this man and I am of the opinion that testimony given so far with regard to his phone call and such are so closely related to the actual incident that there isn't room to believe that he had an opportunity to contrive this thing and fabricate a story. I think testimony given so far, and I don't know what you are going to come in with, so far it is so closely related it is logical to believe that he was in such state that his responses were spontaneous and involuntary and I am going to allow the testimony that is in so far. I think what has been offered so far is admissible."

Rulings on admissibility of *res gestae* statements are within the discretion of the trial court, and we see no abuse of discretion here.

"Whether evidence comes within the *res gestae* rule is a matter which is left to the discretion of the trial judge. An appellate court will reverse his judgment only upon clear proof that he has abused that discretion and committed clear error." 1 Wharton's, Anderson, Criminal Evidence (12th ed.), p. 631, sec. 279.

Defendant cites three cases, all of which are distinguishable from the instant case. In *O'Toole v. State* (1899), 105 Wis. 18, 80 N. W. 915, the statement in question was made the day after the occurrence. In *Gillotti v. State* (1908),

135 Wis. 634, 116 N. W. 252, the statement was made about two hours after the commission of the crime. In *Hamilton v. State* (1920), 171 Wis. 203, 176 N. W. 773, the evidence in question, relating to identification of the defendant, was the testimony of police officers regarding a description given them by a young boy of a man seen by the boy leaving the place of a crime. The boy testified on the trial and the testimony of the officers was merely corroboration thereof. There is no indication as to when the statements were made to the officers, whether they were spontaneous or made while the boy was in a state of nervous excitement produced by witnessing the events which he did; but it is clear from the opinion that the fundamental defect in the evidence was that the boy's identification of the defendant was not positive either on his own testimony or the statements he made to the officers.

Defendant's complaint is that without the officers' testimony there is no evidence of an attempt to "strangle" Pfeiffer; that the victim testified only that an assault took place. It is stated in 6 Wigmore, Evidence (3d ed.), p. 138, sec. 1748:

"It has already been noticed (ante, sec. 1421) that through the exceptions-to-the-hearsay rule run two general principles, one of which is that some necessity shall exist for resorting to hearsay statements. . . . The extrajudicial assertion being better than is likely to be obtained from the same person upon the stand, a necessity or expediency arises for resorting to it. . . .

"It follows that the death, absence, or other unavailability of the declarant need never be shown under this exception—a proposition never disputed."

Since it is recognized that the contemporaneous *res gestae* utterance is "better than is likely to be obtained from the same person upon the stand," there is no reason to exclude it because it goes beyond the testimony given by the declar-

ant. True, Pfeiffer's testimony was weaker than the statements he made to Hollatz and Braatz but the jury was the sole judge, on the basis of all the evidence, of whether defendant actually did attempt to strangle Pfeiffer. In making that determination it was warranted in giving weight to Pfeiffer's contemporaneous statements to that effect.

In any event, Braatz's testimony as to what Pfeiffer told him was admissible, because defendant failed to make the proper objection at the proper time. The officer was asked, "Did you have any conversation with him," and defendant's counsel objected on the ground of hearsay. The court stated, "He has not offered evidence yet," and overruled the objection. The ruling was proper since the objection was premature. Braatz was then asked what the conversation was, "What did Mr. Pfeiffer tell you at that time?" and there was no objection made. It is well established that the question of admissibility of testimony, unless specifically objected to, may not be raised on appeal. See *State v. Hoffman* (1942), 240 Wis. 142, 152, 2 N. W. (2d) 707, and cases there cited. In the *Hoffman Case* (p. 149), the hearsay testimony complained of on appeal was "no part of the *res gestae*" but this court affirmed the judgment even though it would have been error for the trial court to admit the evidence "if proper objection had been made."

Furthermore, the state questioned a Milwaukee police officer, Douglas Bottoni, regarding the arrest and questioning of the defendant on August 15th. In testifying, the officer referred to a written "Report on Prisoner taken to Detective Bureau." Defendant's counsel made use of the report on cross-examination of this witness and stated, "I am making it available in total to the jury so we can use it for whatever value it has and I am glad to stipulate it into the record, . . ." The report, marked Exhibit 7, shows that the Milwaukee police department received a call from Officer Braatz of Oconomowoc at 11:42 p. m., August 14, 1959, who re-

quested that the Milwaukee police department apprehend Edward Dunn who was "wanted for attempting to strangle a man named Clyde in Oconomowoc on 8–14–59 about 10 p. m." The introduction of this evidence by the defendant waived any objection to the previous testimony of Braatz and Hollatz.

The second assignment of error is in the exclusion of the testimony of a psychiatrist, Dr. Owen Otto, as to his findings on examination of Mrs. Pfeiffer.

Mrs. Pfeiffer testified that she and the defendant were in love and that she had sexual relations with him on various occasions between July, 1958, and August 8, 1959; that during that period of time they discussed "marriage plans;" that at first Dunn wanted her to get a divorce and gave her money amounting to $1,000 to do so; that she had not tried to get a divorce because she had no grounds; that then Dunn said "he would have to put both of them [his wife and her husband] out of the way;" that he "talked about a car accident or I believe once there was something mentioned about a shooting."

Referring to the telephone call from Dunn on August 14, 1959, Mrs. Pfeiffer testified:

"I received a call in the morning from Mr. Dunn saying that he was coming out that evening to finish the job or some statement similar to that in which I took it then for granted that he was going to be out there that night."

In accordance with the plans they made over the telephone, Mrs. Pfeiffer picked up the defendant at the trailer court about 9 o'clock that evening. She testified that on their way to the Pfeiffer home Dunn got into the back seat; that he had with him a "little cloth pouch. He had something wrapped inside of it," and had a pair of light-blue gloves with him. She testified the dome light was in place when she went out, and—

"All I know is that Mr. Dunn was doing something in the back seat with the dome light. I believe he was getting ready to take it out, I couldn't say for sure."

· She testified that on arriving at the Pfeiffer home about 9:30 she went into the house, and returned to the car a little later—

"I went back to the automobile to get beach balls and at that time I told Mr. Dunn that he could be seen, hoping he would take that as a warning and get out of the car and leave."

In response to her remark Dunn said nothing but she noticed he crouched down a little bit; she went back into the house. Pfeiffer corroborated her testimony that she went back to the car about 9:45 that evening for the beach balls.

Mrs. Pfeiffer was asked:

"*Q*. Prior to August 14th did you and Mr. Dunn have any discussion as to what was going to happen on August 14th? *A*. Not as to what was going to happen that evening I don't believe.

"*Q*. Had you discussed any plans at all as to what was going to happen on any evening? *A*. Yes, there were several plans.

"*Q*. What were those plans? *A*. One of them that a car accident was going to happen on the way up to Beaver Dam involving all four of us."

She testified that the planned car accident·was foiled because they planned to go in Dunn's car and started out in his car, but they had a couple of flat tires and had to come back and use the Pfeiffer car. She testified Dunn "had something rigged up in the car, some kind of pipe in which gas or fumes of some kind came out. It was supposed to put his wife and my husband to sleep, make them drowsy." Pfeiffer also testified as to a trip to Beaver Dam which the couples had made together, corroborating her statements as to use

of the Dunn car, the flat tires, and the eventual making of the trip in the Pfeiffer car.

Numerous objections were made in the course of the state's attempt to question Mrs. Pfeiffer as to what she understood Dunn to mean by his intention to "finish the job," and finally the following testimony went in without objection:

"*Q*. You stated Mr. Dunn stated that he was going to finish the job. Had he ever discussed with you previous to that time what the job was? *A*. You mean what he was going to use, or what?

"*Q*. What the job was? *A*. Not that I know of, no."

The defense called Dr. Otto as a witness for the purpose of attacking Mrs. Pfeiffer's credibility, counsel stating, "Doctor, so that there is no misunderstanding as to the scope of my questions, I intend to limit them strictly to intelligence and character disorder." During cross-examination of Mrs. Pfeiffer, defense counsel had attempted to secure her consent for Dr. Otto to testify, but she objected. The trial court refused to allow the doctor's testimony, and defendant's counsel made the following offer of proof:

"I want the record to show that I intended to produce Dr. Otto for sole purpose of attacking credibility of the testimony of Margie Pfeiffer; and intended to show by his testimony that she was examined by him on August 31, 1959, and that he would testify that she is of dull-normal intelligence; that her case is that of character disorder, which is known in his field as a schizoid; that this patient is incredibly simple, naive, has childlike outlook and attitude, perhaps one that one could call dreamy, unrealistic, and vague. I intended to show that disorder which he found in his examination was one which would cause the witness to withdraw from reality into what would seem like a dream world of her own creation; that she is unable to cope with ordinary reality in an adequate way and that their needs, dreams, and wishes seem satisfied by their phantasy world. That she is a person who is unable to distinguish between

real and unreal; logic and illogic fact and dream; that she is a person who has lost insight, that her emotional responses are not normal."

The state concedes that the testimony of Dr. Otto was not privileged but points out that defense counsel himself suggested that it was by seeking Mrs. Pfeiffer's consent to it. In any event, exclusion of the doctor's testimony was not prejudicial. The trial court on its own motion put into the record the testimony given by Dr. Otto in State of Wisconsin v. Margie Pfeiffer. The transcript of his testimony in that case discloses in part (abstracted):

"My opinion is that Margie Pfeiffer is sane. That she knows the difference between right and wrong. That she appreciates the nature and quality of her acts. That she can confer with counsel, and is not feeble-minded. In addition, she is of dull-normal intelligence. Intelligence down at the very lowest range of what is average intelligence. She is a type of person easily led by another. She was exceedingly immature. I would say she is more submissive than the average person of her age. . . . I think she can be helped psychologically or psychiatrically. I do not believe her to be a good candidate for psychiatric therapy. I do not believe that she can be changed. I wouldn't suggest any special course of treatment. It seems to me that she needs more-adequate supervision. . . . I do not believe she is dangerous or violent in any way."

The matters there admitted pretty well covered the subject. It was the defendant who was here on trial, not Mrs. Pfeiffer. By the proof offered, defendant sought to impeach the credibility of Mrs. Pfeiffer. It is true that some of her testimony is uncorroborated, that some of it is vague and indicates she is neither very mature nor intelligent, but in those respects in which her testimony bore upon the defendant's motive and intent, it is so consistent with the undisputed evidence in the case that the impeaching testimony of Dr. Otto could have had little value.

We have an admitted adulterous affair between Mrs. Pfeiffer and the defendant; his letters bear out the relationship and show defendant's determination that they should be free, his jealousy of her, his intention to "secure" her "by hook or crook," that he would "always put our togetherness ahead of everything else," and that he was giving her money for a divorce. We have the defendant's presence in the car. We have him identified by Pfeiffer; and his remarks, "this is all for you, bud" when he attacked Pfeiffer, and "I guess I went off my rocker for a minute" after Pfeiffer broke away and "dove out of the window" of the car. Pfeiffer testified Dunn was wearing gloves. The dome fixtures were later found in the back seat of the car. This is all consistent with Mrs. Pfeiffer's testimony that she picked up the defendant and brought him to the Pfeiffer home, during which he "did something" to the dome light; that he had gloves with him; that she left him in the car at the Pfeiffer home, and that defendant had told her he meant to "finish the job."

The third contention of the defendant is that during the cross-examination of Mrs. Pfeiffer the court committed prejudicial error in making the following statement:

"This person had already been in this court in connection with this whole scheme and was represented by her attorney . . ."

However, defendant's counsel did not think this remark important enough to include it as error in his motion for a new trial after verdict. And if error it was, it has been waived by defendant and he cannot now complain of it. Allegations of error must first be presented for consideration of the trial court on a motion for a new trial before this court may consider them. *Ferry v. State* (1954), 266 Wis. 508, 63 N. W. (2d) 741; *State v. Vinson* (1955), 269 Wis. 305, 68 N. W. (2d) 712, 70 N. W. (2d) 1.

Defendant contends it was error for the trial court to admit into evidence the two pieces of wire and the dome bulb and

fixture found in the back seat of the Pfeiffer car after the assault. Pfeiffer told Braatz he felt something come over his face that he thought was wire and that during the struggle the wire broke. Later, when Pfeiffer went with the officers to examine the car, Pfeiffer reached into the back seat, took out a long piece of wire and said, "See, it was wire." As pointed out above, the testimony was received without objection by the defendant.

Mrs. Pfeiffer testified that when she picked up the defendant he had a pair of gloves and a cloth pouch with something wrapped inside. It is a reasonable inference, in the light of the events that ensued and the nature of Pfeiffer's injuries, that the wire was brought into the car by the defendant, wrapped in the cloth pouch, and that the gloves which defendant had with him and which Pfeiffer saw him wearing after the struggle in the car, were used in handling the wire in the assault. There is no evidence to refute the inference.

As pointed out at 20 Am. Jur., Evidence, p. 261, sec. 273, few convictions in criminal cases could be had if direct testimony of eyewitnesses were required, and—

"The modern doctrine is extremely liberal in the admission of any circumstances which may throw light upon the matter being investigated; great latitude must be given the state in the production of its evidence in proof of criminal charges. Much, of course, is left to the discretion of the trial judge, but where the proper determination of a fact depends upon circumstantial evidence, the safe practical rule to follow is that in no case is evidence to be excluded of facts or circumstances connected with the principal transaction from which an inference can be reasonably drawn as to the truth of a disputed fact. All facts tending to elucidate the matter under discussion which are referable to the point in issue tend to exhibit the *res gestae* or to establish a chain of circumstantial evidence in respect of the act charged. It is necessary only that they tend to prove the issue or constitute a link in the chain of evidence. Evidence of circumstances which tend to connect the accused with the commission of a crime is properly admitted, even though inconclusive in character.

Such evidence is competent to establish many varying facts. Circumstantial evidence may alone be available in proving elements of crime, such as malice, intent, or motive, which exist only in the mind of the perpetrator of the deed."

So far as the dome light and cover are concerned, the exhibits have little probative value. Pfeiffer and the officers testified the light had been dismantled. Mrs. Pfeiffer testified that on the way to the Pfeiffer home "Mr. Dunn was doing something in the back seat with the dome light. I believe he was getting ready to take it out, I couldn't say for sure." The jury could properly infer from the testimony that the light was in place when Mrs. Pfeiffer left the house at 9 o'clock and that Dunn removed it to aid in concealing his presence when Pfeiffer entered the car.

Considering all the evidence in the case, the jury was compelled to conclude that defendant planned and intended to murder Pfeiffer by strangulation; that his motive was his desire for Mrs. Pfeiffer; that he would have succeeded in his attempt but for the struggle by Pfeiffer which caused the wire to break. We are satisfied from a thorough study of the record that there was no prejudicial error in the trial.

*By the Court.*—Judgment affirmed.